## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| FRANKENMUTH MUTUAL INSURANCE COMPANY )<br><br>Plaintiff, )<br><br>v. )<br><br>NATIONAL BRIDGE BUILDERS, LLC, WILLIAM H. WEST, III, WILLIAM H. WEST, IV, GEMINI III TRUST, AND GEMINI IV TRUST )<br><br>Defendants. | Case No. |

---

## COMPLAINT

---

Plaintiff Frankenmuth Mutual Insurance Company ("Frankenmuth" or "Company"), by and through counsel, respectfully states the following for its Complaint against Defendants National Bridge Builders, LLC ("National Bridge"), Gemini III Trust, and Gemini IV Trust, (National Bridge, Gemini III Trust, and Gemini IV Trust each individually an "Indemnitor" and collectively the "Indemnitors"), William H. West, III, and William H. West, IV (all Defendants collectively, the "Defendants"):

### I.      PARTIES

1.      Frankenmuth is a corporation formed under the laws of the State of Michigan, with its principal place of business located at 1 Mutual Avenue, Frankenmuth, Michigan 48787.  Thus, Frankenmuth is a citizen of the State of Michigan for purposes of diversity jurisdiction under 28 U.S.C. § 1332(a).

2.      Upon information and belief, National Bridge is a limited liability company formed under the laws of the State of North Carolina, whose members are citizens of the State of North

Carolina. Thus, upon information and belief, National Bridge is a citizen of the State of North Carolina for purposes of diversity jurisdiction under 28 U.S.C. § 1332(a).

3. Upon information and belief, both the trustee(s) and beneficiary(ies) of Gemini III Trust are citizens of the State of North Carolina. Thus, upon information and belief, Gemini III Trust is a citizen of the State of North Carolina for purposes of diversity jurisdiction under 28 U.S.C. § 1332(a).

4. Upon information and belief, both the trustee(s) and beneficiary(ies) of Gemini IV Trust is a citizen of the State of North Carolina. Thus, upon information and belief, Gemini IV Trust is a citizen of the State of North Carolina for purposes of diversity jurisdiction under 28 U.S.C. § 1332(a).

5. Upon information and belief, William H. West, III is a citizen of the State of North Carolina.

6. Upon information and belief, William H. West, IV is a citizen of the State of North Carolina.

## II.   JURISDICTION AND VENUE

7. This Honorable Court possesses original jurisdiction over Frankenmuth's Complaint pursuant to 28 U.S.C. § 1332(a) because the matter in controversy exceeds the sum or value of $75,000 exclusive of interest and costs and the matter in controversy is between citizens of different states (Michigan Plaintiff versus North Carolina Defendants).

8. This Honorable Court possesses the power to declare the respective rights and other legal relations of Frankenmuth and the Defendants as requested herein pursuant to 28 U.S.C. § 2201(a).

9.      This Honorable Court possesses the authority to award the injunctive relief requested herein pursuant to Rule 65 of the Federal Rules of Civil Procedure.

10.      Venue is proper in the United States District Court for the Western District of North Carolina pursuant to 28 U.S.C. § 1391(b) and 28 U.S.C. § 112(c) because a substantial part of the events or omissions giving rise to Frankenmuth's "Loss" and/or anticipated "Loss" (as defined herein) occurred within the Western District of North Carolina (Cleveland and Jackson Counties).

11.      Moreover, pursuant to indemnity agreement at issue in this action, the Indemnitors consented to personal jurisdiction and venue in any court in any state in which any "Contract" is performed and National Bridge performed "Contracts" in the Western District of North Carolina (Cleveland and Jackson Counties).

### III.      FACTUAL ALLEGATIONS

### The Individual Defendants' Relationship With National Bridge

12.      National Bridge has engaged in the construction contracting business since it was established in 2017, which business has included construction activities on various public projects in a number of states including North Carolina, South Carolina, and Virginia.

13.      In order to perform construction activities on public projects, National Bridge is sometimes required to obtain surety bonds, including performance bonds and payment bonds, from sureties such as Frankenmuth.

14.      Upon information and belief, William H. West, III and William H. West, IV are members, officers, and/or agents of National Bridge and direct, control, and/or coordinate National Bridge's construction contracting activities.

15.      Upon information and belief, the direction, control, and/or coordination of National Bridge's construction activities by William H. West, III and William H. West, IV includes, but is

not limited to, their (a) receipt and disbursement of the proceeds of National Bridge's construction contracts, (b) the acquisition and sale of National Bridge's inventory and equipment, and (c) the possession, custody, and/or control of National Bridge's books, records, etc.

**The Indemnity Agreement**

16.     As a condition of Frankenmuth's issuance of surety bonds in relation to certain of National Bridge's construction activities, the Indemnitors executed the General Agreement of Indemnity attached hereto as **Exhibit 1** (the "Indemnity Agreement") in favor of Frankenmuth on or about August 22, 2018.

17.     The Indemnity Agreement defines "Bond" as follows:

Bond - Any and all bonds, undertakings, guarantees, contractual obligations, and writings or statements of prequalification or commitment, including Modifications thereof, which Company has executed or procured, or for which Company has an obligation as a result of an asset purchase, acquisition, merger or like transaction issued for or on behalf of: (a) any one or more of the Indemnitors (without regard to whether any such Indemnitor signed this Agreement), their respective present or future direct or indirect parent companies, subsidiaries and affiliates and all of their respective successors and assigns; (b) any present or future joint venture, co-venture, consortium, partnership, trust, association, limited liability company or other legal entity in which one or more of the persons or entities identified in sub-paragraph (a) above have an interest; (c) any other person or entity at the request of any of the Indemnitors; or (d) any combination of the above, whether executed or procured before, on, or after the execution of this Agreement. For the purpose of this definition the term "Modifications" shall include but not be limited to renewals, substitutions, riders, endorsements, reinstatements, replacements, substitutions, increases or decreases in penal sum, continuations and extensions.

18.     The Indemnity Agreement defines "Company" as follows:

Company - Frankenmuth Mutual Insurance Company, Patriot Insurance Company, any of their present or future direct or indirect parent companies, any of the respective present or future direct or indirect affiliates or subsidiaries of such companies and parent companies, and/or any of the aforementioned entities' successors or assigns. For purposes of this definition the term affiliate includes any entity that controls, is controlled by, or is under common control with Frankenmuth Mutual Insurance Company, Patriot Insurance Company or any of their parent or subsidiary companies, whether control is due to ownership of voting interests,

economic interests or other management or governance contract or arrangement that results in any of such entities exercising control over the affairs of such entity.

19. The Indemnity Agreement defines "Contract" as "[a]ny contract, agreement, commitment or other obligation (however established) the performance of which is guaranteed or covered either in whole or in part under a Bond."

20. The Indemnity Agreement defines "Default" as follows:

Default - Any of the following shall constitute a Default:

(a) a declaration of Contract default by any Obligee;

(b) the actual or alleged breach, abandonment, refusal, inability or failure to perform any Contract;

(c) a breach of any provision of this Agreement;

(d) failure to make payment of a properly due and owing bill in connection with any Contract;

(e) if in the sole opinion of the Company, the contract funds to be paid are insufficient to pay the costs of completing any Contract or Contracts;

(f) diversion of Contract funds or any Indemnitor's assets to the detriment of Contract obligations or any of Company's right's under this Agreement or at law;

(g) any Indemnitor's becoming the subject of any proceeding or agreement of bankruptcy, receivership, insolvency, or creditor assignment, or actually becoming insolvent;

(h) any Indemnitor's dying, becoming legally incompetent, being imprisoned, being convicted of a felony, or disappearing and being unable to be readily located;

(i) any representation furnished to Company by or on behalf of any Indemnitor which was materially false or misleading when made;

(j) any failure of any Indemnitor to perform its obligations under this Agreement in accordance with its terms;

(k) if there is any change in any Indemnitor's financial condition which, in Company's opinion, has or would be reasonably likely to have a material adverse effect with respect to the business, assets, properties, financial condition, stockholders" equity, contingent liabilities, prospects, material

agreements or results of operations of any Indemnitor, Indemnitor's ability to perform its obligations under any Contracts and pay the obligations in accordance with the terms thereof, or the validity or enforceability of this Agreement; and/or

(l) any change in control or existence of any Indemnitor. Change in control means (i) the addition or departure of any person or entity owning a ten percent (10%) or greater ownership interest in any Indemnitor, (ii) the sale of all or substantially all of the assets of any Indemnitor to a third party; (iii) any merger, consolidation, recapitalization, reorganization or other transaction involving an Indemnitor which results in the inability of the persons owning voting or effective control of the Indemnitor prior to such transaction being able to designate or elect a majority of the members of the board of directors (or its equivalent) of the resulting entity or its parent company.

21. The Indemnity Agreement defines "Indemnitor or Indemnitors" as follows:

Indemnitor or Indemnitors - Undersigned, and all new indemnitors added to this Agreement by rider, their present and future direct and indirect subsidiaries; affiliates, and parent companies, and all of their successors and assigns, and any joint venture, co-venture, consortium, partnership, trust, association, limited liability company or other legal entity in which one or more of them hold any ownership interest whether in existence now or formed or acquired hereafter, and any entity that obtains Bonds from Company at the request of any of the aforementioned parties, or any combination of the above.

22. The Indemnity Agreement defines "Loss" as follows:

Loss –All loss, costs and expense of any kind or nature, including attorneys' and other fees or costs, which Company incurs in connection with any Bond, Contract or this Agreement, including but not limited to all loss, cost and expense incurred by reason of:

(a) the underwriting or issuance of any Bond,

(b) making any investigation in connection with any Bond;

(c) any claim, which means any notice, claim, demand, defense, counterclaim, setoff, lawsuit or proceeding or circumstance which may constitute, lead to or result in Loss, liability, or asserted liability in connection with any Bond or this Agreement,

(d) any Indemnitor failing to timely and completely perform under or comply with this Agreement,

(e) Company enforcing this Agreement

(f) Company prosecuting or defending any action in connection with any Bond;

(g) obtaining the release of any Bond;

(h) Company recovering or attempting to recover Property in connection with any Bond or this Agreement

(i) Company enforcing by litigation or otherwise any of the provisions of this Agreement,

(j) any act of Company to protect or procure any of Company's rights, protect or preserve any of the Company's interests, or to avoid or lessen Company's liability or alleged liability, and

(k) all interest accruing on any such amounts at the maximum legal rate.

**Indemnitors' liability to Company includes all Loss, all payments made, and all actions taken by Company under the Good Faith belief that Company is, would be or was liable for the Loss, the amounts paid or the actions taken or that it was necessary or expedient to incur such Loss, make such payments or take such actions, whether or not such liability, necessity or expediency existed. Good Faith means, with respect to any act, exercise of discretion or omission by Company, an absence of dishonesty, evil intent and actual malice toward Indemnitors. An itemized statement of Loss, sworn to by any officer of Company, or vouchers, affidavits, or other evidence of payment by Company, shall be prima facie evidence of Indemnitors' liability for such Loss.**

(Emphasis added).

23.     The Indemnity Agreement defines "Obligee" as "[a]ny person or entity in whose favor a Bond has been issued, and that person's or entity's successors and assigns."

24.     The Indemnity Agreement defines "Property" as follows:

Property - Indemnitors' rights, title and interest, whether now held or hereafter acquired in:

(a) any Contract or contract, including but not limited to subcontracts let;

(b) any and all sums due or which may hereafter become due under any Contract or contract and all damage, claims and proceeds related thereto;

(c) all rights arising under any surety bonds or insurance policies;

(d) any and all accounts receivable, letters of credit, documents of title, bills of lading, warehouse receipts, machinery, plants, equipment, tools, materials, supplies, inventory, vehicles, hardware, software, machine tools, fixtures,

office equipment, books, records, designs, licenses, patents, intellectual property, as-builts, construction drawings and documents, and all electronically stored information; and

(e) any and all real property owned by the Indemnitors, including all fixtures; and

(f) all other personal property now owned or hereafter acquired by each of the Indemnitors, including goods, documents, instruments, general intangibles, accounts, chattel paper, notes receivable, cash, choses in action, policies and proceeds of life, casualty, worker's compensation, liability or other policies of insurance, all intellectual property (including any licenses thereof) and any and all proceeds of collateral.

25. With respect to the Indemnitors' duty to exonerate, indemnify, and save Frankenmuth harmless from and against all "Loss," Paragraph 3 of the Indemnity Agreement states:

**Indemnification and Hold Harmless**: Indemnitors shall exonerate, indemnify and save Company harmless from and against all Loss. An itemized, sworn statement by an employee of Company, or other evidence of payment, shall be prima facie evidence of the propriety, amount and existence of Indemnitors' liability. Amounts due to Company shall be payable upon demand.

26. With respect to Frankenmuth's right, in its sole discretion, to settle any claim against any "Bond," Paragraph 4 the Indemnity Agreement states:

**Claim Settlement**: Company shall have the right, in its sole discretion, to determine for itself and Indemnitors whether any claim, demand or suit brought against Company or any Indemnitor in connection with, arising out of, or relating to any Bond or Contract shall be paid, compromised, settled, tried, defended or appealed, and its determination shall be final, binding and conclusive upon the Indemnitors. Company shall be entitled to immediate reimbursement for any and all Loss incurred under the belief it was necessary or expedient to make such payments.

27. With respect to the Indemnitors' duty to collateralize Frankenmuth upon demand, Paragraph 5 of the Indemnity Agreement states:

**Collateral Security**: Indemnitors agree to deposit with Company, upon demand, funds, other collateral security acceptable to Company, in an amount as determined by Company sufficient to discharge any Loss or anticipated Loss. Indemnitors further agree to deposit with Company, upon demand, an amount equal to the value

of any assets or Contract funds improperly diverted by any Indemnitor. Sums deposited with Company pursuant to this paragraph may be used by Company to pay such claim or be held by Company as collateral security against any Loss or unpaid premium on any Bond. Company shall have no duty to invest, or provide interest on the collateral. Indemnitors agree that Company would suffer irreparable damage and would not have an adequate remedy at law if Indemnitors fail to comply with the provisions of this paragraph. Any remaining funds held by Company after payment of all sums due to Company under this Agreement shall be returned upon the complete release and/or discharge of Company's liability under all Bonds. In addition to the foregoing, Indemnitors shall promptly, on Company's written demand, procure the full and complete discharge of Company from all Bonds demanded by Company and all liability in connection with such Bonds. If Indemnitors are unable to obtain such discharge within the time demanded, Indemnitors shall promptly deposit with Company an amount of money that Company determines is sufficient to collateralize or pay any outstanding bonded obligations, or otherwise make provisions acceptable to Company for the funding of the bonded obligations.

28.     With respect to the Indemnitors' assignment of their "Property" to Frankenmuth as additional collateral, Paragraph 6 of the Indemnity Agreement states:

**Assignment**. The Indemnitors do hereby presently assign, transfer, pledge and convey to Company, subject to the trust herein created and effective as of the date of the Bonds, as additional security to secure the obligations of the Indemnitors, under the Bonds and this Agreement and with respect to any other liability or indebtedness of Indemnitors to Company whether heretofore or hereafter incurred all, jointly and severally, all Property as herein defined, including without limitation:

(a) all monies due or to become due to the Indemnitors as a result of the Contract(s), including but not limited to, progress payments, advances, deferred payments, retained percentages, causes of action against any other party, payment for extra work and proceeds of any delay or other damage claims;

(b) all right, title and interest of the Indemnitors in or growing out of the Contract(s);

(c) all right, title and interest of the Indemnitors in and to all supplies, materials, tools, machinery, plant and equipment of every nature and description that may now or hereafter be related to, or in, on or around the work or the work site covered by the Bonds, and materials purchased or ordered for the performance of the Contract, whether in process of construction, in transit to the site, or in storage elsewhere;

(d) all right, title and interest of the Indemnitors in and to all subcontracts, let or to be let, in connection with the Contract(s) and all bonds covering such subcontracts, and;

(e) all actions, causes of action, claims and demands whatsoever which the Indemnitors may have or acquire against any subcontractor, laborer, materialman, or any other person furnishing or agreeing to supply labor, supplies, materials, tools or other equipment in connection with or on account of the Contract(s), and against any surety or sureties of any subcontractor, laborer or materialman.

29.     With respect to Frankenmuth's remedies against the Indemnitors in the event of a

"Default," Paragraph 7 of the Indemnity Agreement states:

**Remedies**: In the event of a Default, Company shall have the right, in its sole discretion, and without limitation, to take any or all of the following actions:

(a) take possession of the work under any Contract and to complete said Contract, or cause, or consent to, the completion thereof;

(b) immediately take possession of Indemnitors' Property, and utilize the Property for the completion of the work under the Contracts without payment for such use;

(c) assert or prosecute any right or claim in the name of any Indemnitor and to settle any such right or claim as Company sees fit;

(d) execute in the name of any Indemnitor, any instruments deemed necessary or desirable by Company to: (i) provide Company with title to assets, (ii) take immediate possession of Contract funds whether earned or unearned, (iii) collect such sums as may be due Indemnitors and to endorse in the name of Indemnitors, and (iv) collect any negotiable instruments;

(e) require any Obligee to withhold payment of Contract funds unless and until Company consents to its release and/or to direct the payment of said Contract funds to Company or to its designee;

(f) require any Indemnitor at Indemnitor's expense to assemble all or any part of the Property (other than real estate or fixtures) and make it available to Company at any place designated by Company;

(g) be subrogated to all the rights, remedies, properties, funds, securities and receivables relating to Indemnitors' Contracts or contracts and have the right to offset losses on any Contract or Bond against proceeds, funds, or property due from another Contract, bond or contract; and/or

(h) exercise any other rights or remedies set forth herein or otherwise available at law or in equity.

Further, in the event or Default and upon demand Indemnitors shall direct and hereby authorize that any payments, monies, and properties that are due or may become due on any Contract or contract be made payable to, and/or sent directly to, Company, and shall issue whatever writing or notices as deemed necessary by Company to effectuate the default and/or termination of any Contract. Indemnitors' obligations to Company shall not be waived or reduced by any claim, setoff, defense, or other right or cause of action which Indemnitors and/or Company may hold against or which may be asserted by any Indemnitor or any other person or entity arising from or related to any Bond, this Agreement, other agreements, by law or otherwise. The failure of Indemnitors, collectively or individually, to perform or comply with any provision of this Agreement shall cause irreparable harm to Company for which Company has no adequate remedy at law. Company shall be entitled to injunctive relief and/or specific performance, and Indemnitors waive any claims or defenses to the contrary.

30. With respect to the Indemnitors' duty to hold the proceeds of any "Contract" in trust for the benefit and payment of all obligations for which Frankenmuth may be liable under any "Bond," Paragraph 11 of the Indemnity Agreement states:

**Trust Fund**: All payments due or received for or on account of any Contract, whether or not in the possession of any Indemnitor, shall be held in trust as trust funds by Indemnitors for the benefit and payment of all obligations for which Company as beneficiary may be liable under any Bond. Company may open a trust account or accounts with a bank for the deposit of the trust funds. Upon demand, Indemnitors shall deposit therein all trust funds received. Withdrawals from such trust accounts shall require the express consent of Company.

31. With respect to the Indemnitors' duty to furnish Frankenmuth with free access to the Indemnitors' books, records, etc., Paragraph 12 of the Indemnity Agreement states:

**Books, Records and Credit**: Indemnitors shall furnish upon demand, and Company shall have the right of free access to, at reasonable times, the records of Indemnitors including, but not limited to, books, papers, records, documents, contracts, reports, financial information, accounts and electronically stored information, for the purpose of examining and copying them. Indemnitors expressly authorize Company to access their credit records, including, but not limited to, account numbers and/or account balances from financial institutions. To the extent required by law, Indemnitors, upon request, shall be informed whether or not a consumer report has been requested by Company, and if so, of the name and address of the consumer reporting agency furnishing the report.

32. With respect to the Indemnitors' designation as Frankenmuth as their attorney-in-fact with the right, but not the obligation, to exercise all assigned/granted rights, Paragraph 13 of the Indemnity Agreement states:

**Attorney in Fact**: Indemnitors irrevocably constitute, appoint and designate Company as their attorney in fact with the right, but not the obligation, to exercise all rights of Indemnitors assigned or granted to Company and to execute and deliver any other assignments, documents, instruments or agreements deemed necessary by Company to exercise its rights under this Agreement in the name of any Indemnitor; any such action shall not contravene statutory law. Indemnitors ratify and confirm all acts taken by Company and its designees as such attorney-in-fact and agree to protect and hold harmless Company and its designees for all such acts.

33. With respect to the Indemnitors' grant of a security interest in all "Property" to Frankenmuth, Paragraph 14 of the Indemnity Agreement states:

**Security Interest**: As security for their obligations hereunder, Indemnitors hereby grant to Company a security interest in all Property, including without limiting the generality of the forgoing grant, the following properties, assets and rights of Indemnitors wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof: all goods (including inventory, equipment and any accessions thereto), instruments (including promissory notes), documents, accounts, chattel paper, deposit accounts, letter-of-credit rights, securities and all other investment property, supporting obligations, any Contract or contract rights or rights to the payment of money, insurance claims and proceeds, and all general intangibles (collectively the "Collateral"). This Agreement shall for all purposes constitute a Security Agreement for the benefit of Company in accordance with the Uniform Commercial Code ("UCC") and all similar statutes. Indemnitors hereby irrevocably authorize Company, without notice to any Indemnitor, in order to perfect the security interest granted herein to file either: (a) this Agreement or a copy or other reproduction of this Agreement; or (b) any initial financing statements, continuation statements and amendments thereto that indicate the Collateral as all assets of Indemnitors or words of similar effect, as being of an equal or lesser scope or with greater detail and that contain any other information relating to any Indemnitor required by Part 5 of Article 9 of the UCC for the jurisdiction where such financing statement or amendment is filed. Company may add schedules or other documents to this Agreement as necessary to perfect its rights. The failure to file or record this Agreement or any financing statement shall not release or excuse any of the obligations of Indemnitors under this Agreement. in addition to filing financing statements, the Company may take such other actions, and provide such other notices and receive such other acknowledgements from third parties as may be necessary or convenient in the perfection of the security interests granted hereunder. Each Indemnitor shall give thirty (30) days prior written notice

to Company of any changes in the location of any of its respective places of business, of the places where records concerning its accounts or other business records are kept, or the establishment of any new, or the discontinuance of any existing place of business.

34.     With respect to the Indemnitors' consent to jurisdiction and venue in this Court,

Paragraph 16 of the Indemnity Agreement states:

> **Jurisdiction**: In any legal proceeding brought by or against Company that in any way relates to this Agreement, each Indemnitor, for itself and its property, irrevocably and unconditionally submits to the exclusive jurisdiction at the sole and exclusive option of Company, of the courts in any state in which any Indemnitor resides, has property, or in which any Contract is performed. Indemnitors hereby irrevocably and unconditionally submit to the Jurisdiction of said courts and waive and agree not to assert any claim that they are not subject to the jurisdiction of any such court that such proceeding is brought in an inconvenient forum or that the venue of such proceeding is improper.

35.     With respect to Frankenmuth's right to examine and audit all of the Indemnitors'

"Property," books, records, etc., Paragraph 25 of the Indemnity Agreement states:

> **Audits and Inspections**: Indemnitor shall permit any of Company's officers, employees, agents or other representatives to visit and inspect upon reasonable notice during business hours any of the locations of Indemnitor (provided that, while a Default exists, Company may make such visits and inspections at any time without prior notice), to examine and audit all of Indemnitor's Property, books of account, records, reports and other papers, to make copies and extracts therefrom and to discuss its affairs, finances and accounts with its officers, employees and independent certified public accountants. Indemnitor's shall incur expenses at the standard rates charged by Company for such activities when an open claim or default exists. Should Company deem it necessary to visit and inspect when no claim or default exists, it shall do so at its own expense.

### The "Bonds"

36.     In reliance upon Frankenmuth's rights under the Indemnity Agreement,

Frankenmuth issued the following "Bonds" on behalf of National Bridge:

| BOND NO. | OBLIGEE | PROJECT DESCRIPTION | PENAL SUM |
|---|---|---|---|
| SUR0002256 | NCDOT, Division 8 | Grading, Drainage, Paving & Structure | $922,306.00 |

| BOND NO. | OBLIGEE | PROJECT DESCRIPTION | PENAL SUM |
|---|---|---|---|
| SUR0002257 | SC DOT | Emergency Replacement S-1575/Cary's Lake Dam | $2,963,856.00 |
| SUR0002260 | W.C. English, Incorporated | Bridge & Approach Replacement over NS Railroad Rt 29. | $1,157,821.00 |
| SUR000226J | English Construction Company, Inc. | Lakeside Drive Bridge over Blackwater Creek | $514,402.00 |
| SUR0002262 | NCDOT, Contract Standards and Development | Edgecombe County, Bridges #3, 4, 5 over Swift Creek on SR-1404 | $2,194,357.00 |
| SUR0002263 | NCDOT, Contract Standards and Development | ID# C204529, Northampton County | $685,089.00 |
| SUR0002264 | NCDOT, Division 10 | Edgecombe County Bridge Replacements | $1,685,554.00 |
| SUR0002265 | NCDOT, Division 10 | Stanly County Bridge Replacement | $843,852.00 |
| SUR0002266 | NCDOT, Contract Standards and Development | Bridge #93 over Conocannara Swamp on NC-561 | $2,244,449.00 |
| SUR0002267 | NCDOT, Contract Standards and Development | Edgecombe County; Bridge #87 over Swift Creek on NC097 | $1,981,375.00 |
| SUR0002269 | W.C. English, Incorporated | Hickory Riverwalk - EB-5939, 1560 Old Lenoir Rd. | $590,265.00 |
| SUR0002270 | NCDOT | Haywood County, Bridge 401 Replacement | $716,117.00 |
| SUR2001132 | NCDOT, Division 8 | Montgomery County-Replacement of Bridge# 124 over Little River on SR 1340 | $889,301.50 |
| SUR2001133 | NCDOT, Division 5 | Person County - Replacement of Bridge #25. | $987,592.75 |
| SUR2001134 | NCDOT, Division 5 | Franklin County-Replacement of Bridge #20 and 25 | $2,256,939.77 |
| SUR2001135 | NCDOT, Division 9 | Bridge Construction - Forsyth County | $2,678,959.00 |
| SUR2001136 | NCDOT, Division 7 | Bridge Replacement Guilford County | $939,494.00 |
| SUR2001137 | NCDOT, Division 10 | Bridge Replacement Anson County | $1,304,669.00 |
| SUR2001139 | NCDOT, Division 12 | Cleveland County - Bridge Replacement | $1,093,428.00 |

| BOND NO. | OBLIGEE | PROJECT DESCRIPTION | PENAL SUM |
|---|---|---|---|
| SUR2001140 | Flatiron Constructors, Inc. | I-40 Aviation parkway, NCDOTA C204069 | $112,482.00 |
| SUR2001142 | NCDOT | Wake County· Replacement of Bridge No 376 over Little Black Creek on SR-1761 | $1,080,186.00 |
| SUR2001143 | NCDOT, Division 10 | Union County· Replace Bridge #157 over Polecat Creek a Cored Slab Bridge | $519,622.00 |
| SUR2001145 | NCDOT, Division 7 | Guilford County Bridge #293 Over Little Alamance Creek | $693,417.00 |
| SUR2001146 | NCDOT, Contract Standards and Development | Granville County- Bridge No. 42 over Ledge Creek on SR-1724 | $1,064,810.00 |
| SUR2001147 | NCDOT, Division 5 | Bridge Replacement #70 over Flat Creek on SR-132 | $892,464.00 |
| SUR2001148 | NCDOT, Division 4 | Johnston County Bridge 277 over Polecat Branch | $498,335.00 |
| SUR2001149RI | South Carolina Contractor's Licensing Board | Contractor's License Bond | $500,000.00 |
| SUR2001150 | NCDOT, Contract Standards and Development | Bridge Replacement, McDowell County, NC. Project No: C204341. | $12,358,341.00 |
| SUR2001151 | NCDOT, Division 4 | Wayne County· Bridge No. 264 over Thunder Swamp | $590,169.00 |
| SUR2001152 | NCDOT, Division 4 | Wayne County· replace bridge No 93 over Town Creek | $569,506.00 |
| SUR2001156 | United States Fire Insurance Company | Bridge Deck Replacements over NSRR and CSX Railroad | $921,583.00 |
| SUR2001159 | NCDOT, Division 3 | Sampson County Bridge 195, 214 | $1,349,151.00 |
| SUR2001160 | NCDOT, Division 4 | Wilson County - Bridge Nos. 92, 96, 91 and 105 | $2,097,418.00 |
| SUR2001163 | ST Wooten Corporation | Cornwallis Road, Rock Quarry Road, Sunnybrook Road, Drilled Pier Construction | $540,386.00 |
| SUR2001165 | SCDOT | US 521 NB Bridge replacement | $2,797,679.00 |
| SUR2001166 | VDOT | Bridge Replacement Over Smith Creek | $1,166,029.00 |

| BOND NO. | OBLIGEE | PROJECT DESCRIPTION | PENAL SUM |
|---|---|---|---|
| | | TOTAL | $54,401,405.02 |

## The Various "Defaults" Under the Indemnity Agreement

37.    At this juncture, various instances of "Default" exist under the Indemnity Agreement on the Indemnitors' part.

38.    National Bridge has furloughed its employees and has abandoned and/or ceased performing under various "Contract" covered by the "Bonds."

39.    Obligees have notified Frankenmuth that National Bridge has demobilized from the projects and are not completing its obligations and National Bridge will be defaulted.

40.    As detailed below, the Indemnitors have breached various provisions of the Indemnity Agreement.

41.    National Bridge has also failed to make payment of properly due and owing bills in connection with "Contracts" covered by the "Bonds."

42.    National Bridge has also indicated that the remaining proceeds of the "Contracts" are insufficient to pay the costs of completing the "Contract" covered by the "Bonds."

43.    Upon information and belief, National Bridge has, at the direction of William H. West, III and William H. West, IV, diverted proceeds of the "Contracts" covered by the "Bonds" to the detriment of National Bridge's obligations under the "Contracts" and/or to the detriment of Frankenmuth's rights under the Indemnity Agreement.

## Frankenmuth's "Loss" and Exposure to "Loss"

44.    As a result of the various instances of "Default" under the Indemnity Agreement, Frankenmuth has sustained significant "Loss" and remains exposed to significant "Loss" under the "Bonds."

45.     For example, in an effort to mitigate Frankenmuth's anticipated "Loss" under the "Bonds," Frankenmuth advanced $750,000 directly to National Bridge to fund the completion and/or payment of obligations covered by the "Bonds," some of which proceeds National Bridge, at the direction of William H. West, III and William H. West, IV, used for purposes other than the completion and/or payment of obligations covered by the "Bonds."

46.     To date, Frankenmuth has already paid "Loss" in the amount of $425,543.05 to National Bridge's subcontractors and/or suppliers under the "Bonds" for labor, material, equipment, etc. they furnished to National Bridge under the "Contract" covered by the "Bonds."

47.     At this juncture, National Bridge's subcontractors and/or suppliers have also asserted additional claims against the "Bonds" in excess of $1,957,748 relative to additional labor, material, equipment, etc. that was allegedly furnished to National Bridge under the "Contract" covered by the "Bonds."

48.     Though Frankenmuth expressly reserves any and all of its rights, remedies, defenses, etc. under the "Bonds," National Bridge's records indicate that the cost to complete the "Contracts" covered by the "Bonds" significantly exceeds the remaining proceeds of the "Contracts," which in turn exposes Frankenmuth to "Loss" under the "Bonds."

## IV.     CAUSES OF ACTION

### Count 1 — Specific Performance Against the Indemnitors (Collateral)

49.     Frankenmuth hereby restates the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

50.     Pursuant to Paragraph 5 of the Indemnity Agreement, the Indemnitors agreed to deposit with Frankenmuth, upon demand, funds, other collateral security acceptable to

Frankenmuth, in an amount as determined by Frankenmuth sufficient to discharge any "Loss" or anticipated "Loss."

51.     Pursuant to Paragraph 5 of the Indemnity Agreement, the Indemnitors also agreed to deposit with Frankenmuth, upon demand, an amount equal to the value of any assets or "Contract" funds improperly diverted by the Indemnitors.

52.     Paragraph 5 of the Indemnity Agreement also requires the Indemnitors to, on Frankenmuth's written demand, (a) procure the full and complete discharge of Frankenmuth from all "Bonds" and all liability in connection with such "Bond" or (b) promptly deposit with Frankenmuth an amount of money that Frankenmuth determines is sufficient to collateralize or pay any outstanding bonded obligations, or otherwise make provisions acceptable to Frankenmuth for the funding of the bonded obligations.

53.     Pursuant to Paragraph 5 of the Indemnity Agreement, the Indemnitors expressly agreed that Frankenmuth would suffer irreparable damage and would not have an adequate remedy at law if the Indemnitors failed to comply with their collateral obligations under Paragraph 5.

54.     Pursuant to Paragraph 7 of the Indemnity Agreement, the Indemnitors expressly acknowledged that Frankenmuth shall be entitled to injunctive relief and/or specific performance of the Indemnitors' duties under Paragraph 5 of the Indemnity Agreement and the Indemnitors waived any claims or defenses to the contrary.

55.     As reflected by the January 7, 2022 letter from Frankenmuth to National Bridge attached hereto as **Exhibit 2**, Frankenmuth has demanded in writing that National Bridge, among other things, deposit acceptable collateral with Frankenmuth totaling $1,409,932.78, which was the current amount of outstanding claims against the "Bonds" and Frankenmuth's actual "Loss."

56.     Despite Frankenmuth's demand, however, the Indemnitors have not deposited a penny of collateral with Frankenmuth.

57.     The Indemnitors' failure to deposit the demanded collateral with Frankenmuth constitutes a material breach of Paragraph 5 of the Indemnity Agreement.

58.     As the Indemnitors expressly acknowledged in the Indemnity Agreement, Frankenmuth lacks an adequate remedy at law in relation to the Indemnitors' material breach of Paragraph 5 of the Indemnity Agreement.

59.     As the Indemnitors also expressly acknowledged in the Indemnity Agreement, the Indemnitors' material breach of Paragraph 5 of the Indemnity Agreement has caused and continues to cause irreparable harm to Frankenmuth because, among other things, Frankenmuth is being deprived of its bargained for right to receive, hold, and/or utilize acceptable collateral relative to the claims that have been and/or may be asserted against Frankenmuth by reason of having issued the "Bonds."

60.     The balance of the equities weighs heavily in favor of entering an injunction and/or judgment in favor of Frankenmuth for specific performance of the Indemnitors' obligations under Paragraph 5 of the Indemnity Agreement because, among other things, Frankenmuth is merely seeking to enforce the terms of the Indemnity Agreement to which the Indemnitors voluntarily agreed and Frankenmuth continues to be deprived of its bargain-for right to receive, hold, and/or utilize acceptable collateral relative to the claims that have been and/or may be asserted against Frankenmuth relative to the "Bonds."

61.     Compelling the Indemnitors to collateralize Frankenmuth under Paragraph 5 of the Indemnity Agreement would strengthen the public interests of enforcing the clear and

unambiguous terms of written indemnity agreements in the State of North Carolina, while instilling confidence in the surety industry in the State of North Carolina.

62. Though Frankenmuth expressly reserves any and all of its rights, remedies, defenses, etc. under the "Bonds," Frankenmuth has determined that acceptable collateral in the amount of $2,383,291.00 is necessary to discharge any "Loss" and/or anticipated "Loss" that Frankenmuth faces by reason of having issued the "Bonds."

63. Therefore, Frankenmuth is entitled to the entry of an injunction/judgment compelling the Indemnitors to (a) specifically perform their obligation to deposit acceptable collateral with Frankenmuth totaling $2,383,291.00 pursuant to Paragraph 5 of the Indemnity Agreement and (b) barring the Indemnitors from transferring, encumbering, or otherwise dissipating of any "Property" assigned as collateral to Frankenmuth under the Indemnity Agreement.

## Count 2 — Specific Performance Against the Indemnitors (Access to Books, Records, Etc.)

64. Frankenmuth hereby restates the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

65. Paragraph 12 of the Indemnity Agreement obligates the Indemnitors to furnish Frankenmuth, upon demand, the right of free access to, at reasonable times, the records of the Indemnitors including, but not limited to, books, papers, records, documents, contracts, reports, financial information, accounts and electronically stored information, for the purpose of examining and copying them.

66. Paragraph 25 of the Indemnity Agreement further obligates the Indemnitors to permit any of Frankenmuth's officers, employees, agents or other representatives to visit and inspect upon reasonable notice during business hours any of the locations of the Indemnitors

(provided that, while a Default exists, Frankenmuth may make such visits and inspections at any time without prior notice), to examine and audit all of the Indemnitors' "Property," books of account, records, reports and other papers, to make copies and extracts therefrom and to discuss the Indemnitors' affairs, finances and accounts with their officers, employees and independent certified public accountants.

67.     At this juncture, numerous instances of "Default" exist under the Indemnity Agreement on the Indemnitors' part.

68.     As reflected by Exhibit 2, Frankenmuth has demanded that National Bridge immediately make its books, records, etc. available for examination, copying, and/or auditing as required by Paragraphs 12 and 25 of the Indemnity Agreement.

69.     Despite Frankenmuth's demand, however, National Bridge has failed and/or refused to make its books, records, etc. available for examination, copying, and/or auditing as required by Paragraphs 12 and 25 of the Indemnity Agreement.

70.     National Bridge's failure to make its books, records, etc. available for examination, copying, and/or auditing constitutes a material breach of Paragraphs 12 and 25 of the Indemnity Agreement.

71.     Frankenmuth lacks an adequate remedy at law in relation to National Bridge's material breach of Paragraphs 12 and 25 of the Indemnity Agreement.

72.     National Bridge's material breach of Paragraphs 12 and 25 of the Indemnity Agreement has caused and continues to cause irreparable harm to Frankenmuth because, among other things, Frankenmuth is being deprived of its bargained for right to examine, copy, and/or audit information that is vital to Frankenmuth's assessment and mitigation of its "Loss" and/or anticipated "Loss" under the "Bonds."

73. The balance of the equities weighs heavily in favor of entering an injunction and/or judgment in favor of Frankenmuth for specific performance of the Indemnitors' duty to make their books, records, etc. available for examination, copying, and/or auditing as required by Paragraphs 12 and 25 of the Indemnity Agreement.

74. Pursuant to Paragraph 7 of the Indemnity Agreement, the Indemnitors acknowledged that Frankenmuth shall be entitled to injunctive relief and/or specific performance of the Indemnitors' duties under Paragraphs 12 and 25 of the Indemnity Agreement and the Indemnitors waived any claims or defenses to the contrary.

75. Compelling the Indemnitors to make their books, records, etc. available for examination, copying, and/or auditing as required by Paragraphs 12 and 25 of the Indemnity Agreement would strengthen the public interests of enforcing the clear and unambiguous terms of written indemnity agreements in the State of North Carolina, while instilling confidence in the surety industry in the State of North Carolina.

76. Therefore, Frankenmuth is entitled to the entry of an injunction/judgment compelling the Indemnitors to specifically perform their obligation to make their books, records, etc. available for examination, copying, and/or auditing as required by Paragraphs 12 and 25 of the Indemnity Agreement.

### Count 3 — Specific Performance Against National Bridge (Trust Funds)

77. Frankenmuth hereby restates the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

78. Pursuant to Paragraph 11 of the Indemnity Agreement, the Indemnitors acknowledged that all payments due or received for or on account of any "Contract," whether or not in the possession of National Bridge, shall be held in trust as trust funds by the Indemnitors for

the benefit and payment of all obligations for which Frankenmuth as beneficiary may be liable under any "Bond."

79. By virtue of Paragraph 11 of the Indemnity Agreement, a trust (express, constructive, and/or resulting) is imposed upon the proceeds of all "Contracts" covered by the "Bonds" for the sole benefit of Frankenmuth and payment of all obligations for which Frankenmuth as beneficiary may be liable under the "Bonds."

80. Paragraph 11 of the Indemnity Agreement authorizes Frankenmuth to open a trust account or accounts with a bank for the deposit of the trust funds.

81. As authorized by Paragraph 11 of the Indemnity Agreement, Frankenmuth has opened accounts into which all proceeds of the "Contracts" covered by the "Bonds" are to be deposited.

82. However, National Bridge has failed to deposit certain proceeds of the "Contracts" covered by the "Bonds" into the accounts established by Frankenmuth.

83. National Bridge's failure to deposit certain proceeds of the "Contracts" covered by the "Bonds" into the accounts established by Frankenmuth constitutes a material breach of Paragraph 11 of the Indemnity Agreement.

84. Frankenmuth lacks an adequate remedy at law in relation to National Bridge's material breach of Paragraph 11 of the Indemnity Agreement.

85. National Bridge's material breach of Paragraph 11 of the Indemnity Agreement has caused and continues to cause irreparable harm to Frankenmuth because, among other things, the proceeds of the "Contracts" covered by the "Bonds" have been and/or may be used for purposes other than payment of all obligations for which Frankenmuth as beneficiary may be liable under the "Bonds."

86.     The balance of the equities weighs heavily in favor of entering an injunction and/or judgment in favor of Frankenmuth for specific performance of National Bridge's duty to deposit the proceeds of the "Contracts" covered by the "Bonds" into the accounts established by Frankenmuth as required by Paragraph 11 of the Indemnity Agreement.

87.     Pursuant to Paragraph 7 of the Indemnity Agreement, the Indemnitors acknowledged that Frankenmuth shall be entitled to injunctive relief and/or specific performance of National Bridge's duties under Paragraph 11 of the Indemnity Agreement and the Indemnitors waived any claims or defenses to the contrary.

88.     Compelling National Bridge to deposit the proceeds of the "Contracts" covered by the "Bonds" into the accounts established by Frankenmuth as required by Paragraph 11 of the Indemnity Agreement would strengthen the public interests of enforcing the clear and unambiguous terms of written indemnity agreements in the State of North Carolina, while instilling confidence in the surety industry in the State of North Carolina.

89.     Therefore, Frankenmuth is entitled to the entry of an injunction/judgment compelling National Bridge to specifically perform its obligation to deposit the proceeds of the "Contracts" covered by the "Bonds" into the accounts established by Frankenmuth as required by Paragraph 11 of the Indemnity Agreement.

## Count 4 — Breach of Contract Against the Indemnitors (Damages)

90.     Frankenmuth hereby restates the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

91.     Paragraph 3 of the Indemnity Agreement obligates the Indemnitors to exonerate, indemnify, and save Frankenmuth harmless from and against all "Loss," which includes, but is not limited to, all loss, costs, and expenses of any kind or nature, including attorneys' and other fees

are costs, which Frankenmuth incurs in connection with any "Bond," "Contract," or the "Indemnity Agreement."

92.     To date, Frankenmuth has incurred and continues to incur "Loss" as defined by the Indemnity Agreement.

93.     Frankenmuth has paid all "Loss" and has taken all other actions relative to the "Bonds" in the honest belief that (a) Frankenmuth is, would be, or was liable for the "Loss," for the amounts paid, or the actions taken or (b) it was necessary or expedient for Frankenmuth to incur such "Loss," make such payments, or take such actions.

94.     Despite Frankenmuth's demand, however, the Indemnitors have failed to exonerate, indemnify, and save Frankenmuth harmless from and against all "Loss" as required by Paragraph 3 of the Indemnity Agreement.

95.     The Indemnitors' failure to exonerate, indemnify, and save Frankenmuth harmless from and against all "Loss" constitutes a material breach of Paragraph 3 of the Indemnity Agreement.

96.     Frankenmuth has been damaged as a result of the Indemnitors' material breach of Paragraph 3 of the Indemnity Agreement in an amount to be proven at trial.

97.     Therefore, Frankenmuth is entitled to the entry of a judgment against the Indemnitors in an amount sufficient to fully exonerate, indemnify, and save Frankenmuth harmless from and against all "Loss," which amount will be proven at trial.

## Count 5 — Conversion of Trust Funds By Defendants

98.     Frankenmuth hereby restates the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

99.     Paragraph 11 of the Indemnity Agreement imposed a trust (express, constructive, and/or resulting) upon the proceeds of all "Contracts" covered by the "Bonds" for the sole benefit of Frankenmuth and payment of all obligations for which Frankenmuth as beneficiary may be liable under the "Bonds."

100.    Each of the Defendants had knowledge of the trust imposed upon the proceeds of "Contracts" covered by the "Bonds" for the sole benefit of Frankenmuth and payment of all obligations for which Frankenmuth as beneficiary may be liable under the "Bonds."

101.    Upon information and belief, National Bridge misused and/or misappropriated certain proceeds of the "Contracts" covered by the "Bonds" for purposes other than the payment of obligations for which Frankenmuth may be liable under the "Bonds."

102.    Upon information and belief, William H. West, III and William H. West, IV directed, controlled, coordinated, and/or participated in National Bridge's misuse and/or misappropriation of certain proceeds of the "Contracts" covered by the "Bonds" for purposes other than the payment of obligations for which Frankenmuth may be liable under the "Bonds."

103.    To the extent the Defendants misused and/or misappropriated proceeds of the "Contracts" covered by the "Bonds" for purposes other than the payment of obligations for which Frankenmuth may be liable under the "Bonds," such exercise of dominion and control over the proceeds of the "Contracts" covered by the "Bonds" would be unlawful/unauthorized and would be inconsistent with Frankenmuth's rights as the trust beneficiary.

104.    Therefore, Frankenmuth possesses a conversion claim against the Defendants to the extent the Defendants misused and/or misappropriated proceeds of the "Contracts" covered by the "Bonds" for purposes other than the payment of obligations for which Frankenmuth may be liable under the "Bonds."

105.    Accordingly, Frankenmuth is entitled to a judgment against the Defendants in an amount equal to any proceeds of the "Contracts" covered by the "Bonds" that the Defendants misused and/or misappropriated for purposes other than the payment of obligations for which Frankenmuth may be liable under the "Bonds" in an amount to be proven at trial.

### Count 6 — Breach of Fiduciary Duty Against the Indemnitors

106.    Frankenmuth hereby restates the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

107.    By virtue of the trust imposed upon the proceeds of the "Contracts" covered by the "Bonds" under Paragraph 11 of the Indemnity Agreement, the Indemnitors stood as a trustee in relation to the proceeds of the "Contract" covered by the "Bonds."

108.    By virtue of the trust imposed upon the proceeds of the "Contracts" covered by the "Bonds" under Paragraph 11 of the Indemnity Agreement, Frankenmuth stood as a trust beneficiary in relation to the proceeds of the "Contracts" covered by the "Bonds."

109.    By virtue of the trustee and trust beneficiary relationship arising out of Paragraph 11 of the Indemnity Agreement, the Indemnitors owed a fiduciary duty to Frankenmuth to utilize the proceeds of "Contracts" covered by the "Bonds" for the sole benefit of Frankenmuth and payment of all obligations for which Frankenmuth as beneficiary may be liable under the "Bonds."

110.    To the extent the Defendants misused and/or misappropriated proceeds of the "Contracts" covered by the "Bonds" for purposes other than the payment of obligations for which Frankenmuth may be liable under the "Bonds," the Indemnitors breached their fiduciary duty to Frankenmuth.

111.    To the extent the Indemnitors breached their fiduciary duty by misusing and/or misappropriating proceeds of the "Contracts" covered by the "Bonds" for purposes other than the payment of obligations for which Frankenmuth may be liable under the "Bonds," Frankenmuth has been damaged in an amount that will be proven at trial.

### Count 7 — Aiding and Abetting Breach of Fiduciary Duty by William H. West, III and William H. West, IV

112.    Frankenmuth hereby restates the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

113.    As detailed herein, William H. West, III and William H. West, IV had knowledge that National Bridge held the proceeds of the "Contracts" covered by the "Bonds" in trust for the sole benefit of Frankenmuth and payment of all obligations for which Frankenmuth as beneficiary may be liable under the "Bonds."

114.    Accordingly, William H. West, III and William H. West, IV had knowledge of the fiduciary duty arising from the relationship of National Bridge as trustee and Frankenmuth as trust beneficiary relative to the proceeds of the "Contracts" covered by the "Bonds."

115.    Despite their knowledge that such conduct would constitute a breach of the fiduciary duty National Bridge owed to Frankenmuth, William H. West, III and William H. West, IV, upon information and belief, directed, controlled, and/or coordinated National Bridge's use of proceeds of the "Contracts" covered by the "Bonds" for purposes other than the payment of obligations for which Frankenmuth may be liable under the "Bonds."

116.    Despite their knowledge that such conduct would constitute a breach of the fiduciary duty National Bridge owed to Frankenmuth, William H. West, III and William H. West, IV, upon information and belief, also encouraged, substantially assisted, and/or participated in

National Bridge's use of proceeds of the "Contracts" covered by the "Bonds" for purposes other than the payment of obligations for which Frankenmuth may be liable under the "Bonds."

117. To the extent William H. West, III and William H. West, IV directed, controlled, coordinated, encouraged, substantially assisted, and/or participated in National Bridge's use of proceeds of the "Contracts" covered by the "Bonds" for purposes other than the payment of obligations for which Frankenmuth may be liable under the "Bonds," Frankenmuth possesses a claim against William H. West, III and William H. West, IV for aiding and abetting National Bridge's breach of the fiduciary duty it owed to Frankenmuth in an amount equal to the proceeds of the "Contracts" covered by the "Bonds," which will be proven at trial.

### Count 8 — Money Had and Received by William H. West, III and William H. West, IV

118. Frankenmuth hereby restates the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

119. Upon information and belief, William H. West, III and William H. West, IV have received and retained proceeds of the "Contracts" covered by the "Bonds" under circumstances that in equity and good conscience William H. West, III and William H. West, IV ought not retain them and injustice and fairness they belong to Frankenmuth, the equitable title holder of the proceeds of the "Contracts" covered by the "Bonds."

120. Therefore, to the extent William H. West, III and William H. West, IV have received proceeds of the "contracts" covered by the "Bonds" under circumstances that in equity and good conscience they ought not retain them and injustice and fairness they belong to Frankenmuth, Frankenmuth possesses a claim against William H. West, III and William H. West, IV for money had and received and is entitled to judgment in the amount of the proceeds of the "Contract Sum" covered by the "Bonds" they inequitably received.

WHEREFORE, PREMISES CONSIDERED, Frankenmuth prays for the following relief:

a. For the issuance of process requiring each of the Defendants to answer Frankenmuth's Complaint;

b. For the entry of an injunction/judgment compelling the Indemnitors to (i) specifically perform their obligation to deposit acceptable collateral with Frankenmuth totaling $2,383,291 pursuant to Paragraph 5 of the Indemnity Agreement and (ii) barring the Indemnitors from transferring, encumbering, or otherwise dissipating of any "Property" assigned as collateral to Frankenmuth under the Indemnity Agreement (Count 1);

c. For entry of an injunction/judgment compelling the Indemnitors to specifically perform their obligation to make their books, records, etc. available for examination, copying, and/or auditing as required by Paragraphs 12 and 25 of the Indemnity Agreement (Count 2);

d. For the entry of an injunction/judgment compelling National Bridge to specifically perform its obligation to deposit the proceeds of the "Contracts" covered by the "Bonds" into the accounts established by Frankenmuth as required by Paragraph 11 of the Indemnity Agreement (Count 3);

e. For entry of a judgment against the Indemnitors in an amount sufficient to fully exonerate, indemnify, and save Frankenmuth harmless from and against all "Loss," which amount will be proven at trial (Count 4);

f. For the entry of a judgment against the Defendants in an amount equal to any proceeds of the "Contracts" covered by the "Bonds" that the Defendants misused and/or misappropriated for purposes other than the payment of obligations for which Frankenmuth may be liable under the "Bonds" an amount to be proven at trial (Count 5);

g. For the entry of a judgment in an amount sufficient to compensate Frankenmuth to the extent the Indemnitors breached their fiduciary duty by misusing and/or misappropriating proceeds of the "Contracts" covered by the "Bonds" for purposes other than the payment of obligations for which Frankenmuth may be liable under the "Bonds" (Count 6);

h. For the entry of a judgment in an amount sufficient to compensate Frankenmuth to the extent William H. West, III and William H. West, IV directed, controlled, coordinated, encouraged, substantially assisted, and/or participated in National Bridge's use of proceeds of the "Contracts" covered by the "Bonds" for purposes other than the payment of obligations for which Frankenmuth may be liable under the "Bonds" (Count 7);

i. For the entry of judgment in an amount sufficient to compensate Frankenmuth to the extent William H. West, III and William H. West, IV have received and retained proceeds of the "Contracts" covered by the "Bonds" under

circumstances that in equity and good conscience William H. West, III and William H. West, IV ought not retain them and injustice and fairness they belong to Frankenmuth (Count 8); and

j.   For such further relief, both general and specific, as may be appropriate in accordance with the nature of this cause including, but not limited to, pre-judgment and post-judgment interest.

Respectfully submitted,

/s/ Jeffrey S. Price
Jeffrey S. Price N.C. Bar No. 42590
MANIER & HEROD
1201 Demonbreun Street, Suite 900
Nashville, Tennessee 37203
Phone: (615) 244-0030
Fax: (615) 242-4203
jprice@manierherod.com

*Attorneys for Frankenmuth Mutual Insurance Company*
