# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
### CIVIL CASE NO. 1:22-cv-00024-MR-WCM

| | | |
|---|---|---|
| FRANKENMUTH MUTUAL INSURANCE CO., | ) ) ) | |
| Plaintiff, | ) ) | **MEMORANDUM OF DECISION AND ORDER** |
| vs. | ) ) | |
| NATIONAL BRIDGE BUILDERS, LLC, WILLIAM H. WEST, III, WILLIAM H. WEST, IV, GEMINI III TRUST, and GEMINI IV TRUST, | ) ) ) ) ) | |
| Defendants. | ) ) ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on the Plaintiff's Motion for Preliminary Injunction Compelling Deposit of Collateral and Access to Books and Records [Doc. 13], the Plaintiff's Motion to Withdraw Motion for Preliminary Inunction [Doc. 40], the Plaintiff's Second Motion for Preliminary Injunction Compelling Deposit of Collateral and Access to Books and Records [Doc. 37], and the Defendant's Motion for Preliminary Injunction [Doc. 69].

## I.    PROCEDURAL BACKGROUND

On February 10, 2022, the Plaintiff, Frankenmuth Mutual Insurance Company ("Plaintiff"), initiated this action against Defendants National Bridge

Builders, LLC ("National Bridge"), William H. West, III, William H. West, IV, Gemini III Trust, and Gemini IV Trust. [Doc. 1]. In its Complaint, the Plaintiff asserts, in relevant part, that the Defendant breached the parties' General Agreement of Indemnity (the "Purported Indemnity Agreement") and that the Plaintiff is entitled to a judgment compelling the Defendants to deposit collateral with the Plaintiff and allow the Plaintiff access to books and records. [Doc. 1 at ¶¶ 49-76]. On May 11, 2022, Defendant National Bridge asserted Counterclaims against the Plaintiff for fraud in the inducement and unfair and deceptive trade practices. [Countercl., Doc. 10 at ¶¶ 25-43].

On June 16, 2022, the Plaintiff filed a Motion for Preliminary Injunction ("First Motion for Preliminary Injunction") seeking a preliminary injunction compelling the Defendants to deposit collateral security with the Plaintiff in the amount of $17,000,000 and to allow the Plaintiff access to the Defendants' books and records. [Doc. 13].

On July 28, 2022, Defendants William H. West, III, William H. West, IV, Gemini III Trust, and Gemini IV Trust moved to dismiss the Plaintiff's claims against them. [Doc. 28]. On August 30, 2022, the Plaintiff moved to voluntarily dismiss its claims against Defendants William H. West, III, William H. West, IV, Gemini III Trust, and Gemini IV Trust. [Doc. 33]. On September 1, 2022, this Court dismissed the Plaintiff's claims against Defendants

William H. West, III, William H. West, IV, Gemini III Trust, and Gemini IV Trust, thereby leaving Defendant National Bridge as the only remaining defendant in this action. [Doc. 34].

On October 31, 2022, the Plaintiff filed a Motion to Withdraw Motion for Preliminary Injunction. [Doc. 40]. Simultaneously, the Plaintiff filed a Second Motion for Preliminary Injunction Compelling Deposit of Collateral and Access to Books and Records ("Second Motion for Preliminary Injunction"). [Doc. 37]. In its Second Motion for Preliminary Injunction, the Plaintiff seeks an injunction compelling Defendant National Bridge to "(1) deposit funds or other collateral security with [the Plaintiff] in the amount of $15,910,811.76, which is the minimum amount [the Plaintiff] has determined to be sufficient to discharge any actual or anticipated 'Loss,' and (2) furnish [the Plaintiff] immediate access to [the Defendant's] books, records, accounts, etc. for copying, examination, and/or auditing." [Id. at 1].

On November 14, 2022, this Court entered an Order granting the Plaintiff's Motion to Withdraw Motion for Preliminary Injunction, withdrawing the Plaintiff's First Motion for Preliminary Injunction, and granting the Plaintiff's Second Motion for Preliminary Injunction. [Doc. 41]. Later that day, Defendant National Bridge filed a Motion for Reconsideration [Doc. 42] of the Court's November 14, 2022 Order and a Motion for Extension of Time

[Doc. 43] to respond to the Plaintiff's Second Motion for Preliminary Injunction. On November 16, 2022, the Defendant moved to withdraw the Motion for Reconsideration and Motion for Extension of Time. [Doc. 44].

On November 18, 2022, Defendant National Bridge appealed this Court's November 14, 2022 Order to the United States Court of Appeals for the Fourth Circuit. [Doc. 45]. On that same day, this Court vacated its November 14, 2022 Order and granted Defendant National Bridge an additional seven days to respond to the Plaintiff's Second Motion for Preliminary Injunction. [Doc. 47]. On November 28, 2022, Defendant National Bridge filed a Response in Opposition to the Plaintiff's Second Motion for Preliminary Injunction. [Doc. 48]. On December 28, 2022, Defendant National Bridge filed a Notice of Withdrawal stating that it had withdrawn its appeal of the Court's November 14, 2022 Order. [Doc. 60].

On December 6, 2022, Defendant National Bridge filed a Motion for Leave to File Amended Motion to Dismiss, Affirmative Defenses, Answer and Counterclaims and Motion to Defer Ruling to Allow Consideration of Amended Pleadings ("Motion to Amend"). [Doc. 54]. On January 4, 2023, the Honorable W. Carleton Metcalf, United States Magistrate Judge, entered an Order granting in part Defendant National Bridge's Motion to Amend and

4

directed Defendant National Bridge to file its amended answer and counterclaims on or before January 11, 2023. [Doc. 62]

On January 11, 2023, the Defendant filed its Amended Answer and Counterclaims and asserted Counterclaims against the Plaintiffs for fraud in the inducement, unfair and deceptive trade practices, breach of contract, breach of implied covenant of good faith and fair dealing, tortious interference with contract, and defamation. [Amended Countercl., Doc. 63 at ¶¶ 51-114]. Further, throughout its Amended Answer and Counterclaims, the Defendant now asserts that the Purported Indemnity Agreement is invalid because it was not properly executed. [Id. at ¶¶ 41-43, 62, 96].

On January 27, 2023, the Defendant filed a Motion for Preliminary Injunction ("Defendant's Motion for Preliminary Injunction"). [Doc. 69]. In the Defendant's Motion for Preliminary Injunction, the Defendant seeks an injunction estopping the Plaintiff from "(1) [the Plaintiff's] wrongful seizure of [the Defendant's] assets; (2) [the Plaintiff's] enforcement of Uniform Commercial Code ('UCC') filings, which purport to grant [the Plaintiff] rights to [the Defendant's] receivables and collateral; and (3) any further action by [the Plaintiff] against [the Defendant] that purports to arise from the rights and obligations set-forth in the [Purported Indemnity Agreement]." [Id. at 1]. The Defendant further seeks an injunction "ordering [the Plaintiff] to return

5

all assets of [the Defendant] that [the Plaintiff] has already seized pursuant to the Purported Indemnity Agreement or estop [the Plaintiff] from distributing said assets to any third-party or individual during the pendency" of this action. [Id.].

## II.    STANDARD OF REVIEW

A plaintiff seeking a preliminary injunction must demonstrate that (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm absent injunctive relief, (3) the balance of the equities tips in his favor, and (4) the injunction would be in the public interest.  Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20, 129 S. Ct. 365, 374, 172 L.Ed.2d 249 (2008). "A preliminary injunction is an extraordinary remedy never awarded as of right."  Id. at 24, 129 S. Ct. at 376.  Thus, in each case the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531, 542, 107 S. Ct. 1396, 1403, 94 L.Ed.2d 542 (1987).  A plaintiff's entitlement to preliminary injunctive relief is a matter of discretion with the Court.  See Metro. Regul. Info. Sys., Inc. v. Am. Home Realty Network, Inc., 722 F.3d 591, 595 (4th Cir. 2013).

"When considering a motion for preliminary injunction, a district court may assess the relative strength and persuasiveness of the evidence

presented by the parties, and is not required to resolve factual disputes in favor of the non-moving party." Queen Virgin Remy, Co. v. Thomason, No. 1:15-cv-1638-SCJ, 2015 WL 11422300, at *2 (N.D. Ga. June 10, 2015), modified No. 1:15-cv-1638-SCJ, 2015 WL 11455760 (N.D. Ga. Oct. 21, 2015) (citing Imaging Bus. Machs., LLC v. BancTec, Inc., 459 F.3d 1186, 1192 (11th Cir. 2006)). If the evidence is contested, however, the court must "assess the facts, draw whatever reasonable inferences it might favor, and decide the likely ramifications." Weaver v. Henderson, 984 F.2d 11, 14 (1st Cir. 1993) (quoting Indep. Oil & Chem. Workers of Quincy, Inc. v. Proctor & Gamble Mfg. Co., 864 F.2d 927, 933 (1st Cir. 1988)).

## III.    FACTUAL BACKGROUND

The Plaintiff is a corporation incorporated under the laws of Michigan, and it has its principal place of business in Michigan. [Doc. 1 at ¶ 1]. Defendant National Bridge is a limited liability company formed in 2017 under the laws of North Carolina. [Id. at ¶¶ 2, 12]. The Defendant is engaged in the construction contracting business, including construction activities on public projects in North Carolina, South Carolina, and Virginia. [Id. at ¶ 12].

Gemini III Trust and Gemini IV Trust act as members of National Bridge, and both trusts hold a fifty percent ownership interest in National Bridge. [West, IV Dec., Doc. 50 at ¶¶ 1-2; Amended West, III Dec., Doc. 51

7

at ¶¶ 1-2]. William H. West, III is the sole Trustee of Gemini III Trust, and William H. West, IV Is the sole Trustee of Gemini IV Trust. [West, IV Dec., Doc. 50 at ¶ 3; Amended West, III Dec., Doc. 51 at ¶ 3]. William H. West, III and William H. West, IV are co-managers of Defendant National Bridge. [West, IV Dec., Doc. 50 at ¶ 4; Amended West, III Dec., Doc. 51 at ¶ 4]. Defendant National Bridge's Operating Agreement (the "Operating Agreement") reads, in part, as follows:

> (c) The number of Managers, and the Person(s) serving from time to time as Manager(s) shall be designated in writing from time to time by a Majority in Interest of the Members. The number of Managers shall be two (2), and William H. West, III ("Blu") and William H. West, IV ("Bret") shall serve as Managers.
>
> . . .
>
> (e) Subject to Section 8.5, each Manager shall have equal rights and authority to participate in the management of the Company, and each Manager shall have the authority, acting alone, to execute documents on behalf of the Company and to bind the Company with respect to transactions occurring in the ordinary course of the Company's business in which the aggregate amount to be paid to or by the Company is $10,000 or less. At any time that there is more than one Manager, all decisions, elections, determinations, or other actions or omissions, other than decisions regarding transactions occurring in the ordinary course of the Company's business in which the aggregate amount to be paid to or by the Company is $10,000 or less, to be taken or made by the Managers in such capacity, under this Agreement or otherwise, shall require the approval, consent,

8

> agreement, or ratification of a majority of the Managers. The approval, consent, agreement, or ratification of a Manager may be given by a Manager either (i) verbally at a meeting at which two or more of the Managers are participating (whether in person or by electronic means allowing each participant to be heard by, and to hear, each other participant) or (ii) in a writing signed by the Manager (whether with or without a meeting).

[Doc. 50-1 at 8-9].

In 2018, Defendant National Bridge solicited surety bonds from the Plaintiff. [Third Maloney Dec., Doc. 53 at ¶ 2]. On August 22, 2018, a user with the email address dena@nationalbridgebuilders.us electronically executed the Purported Indemnity Agreement with the Plaintiff via Docusign. [Doc. 53-10 at 11-12]. This user signed the Purported Indemnity Agreement as "William H. West." [Id.]. Dena Brown is the sister of William H. West, III and William H. West, IV. [Third Maloney Dec., Doc. 53 at ¶ 2]. William H. West, III and William H. West, IV did not execute the Purported Indemnity Agreement, review the Purported Indemnity Agreement, or receive a Docusign link to the Purported Indemnity Agreement. [West, IV Dec., Doc. 50 at ¶¶ 9-11; Amended West, III Dec., Doc. 51 at ¶¶ 9-11].

In the Defendant's 2018 Limited Liability Company Annual Report, Dena Brown is listed as National Bridge's Secretary, and she is the only company official listed. [Doc. 53-1]. In August of 2018, five days before

executing the Purported Indemnity Agreement, Dena Brown signed a Letter of Intent to Perform as a Subcontractor with a total commitment amount of $24,355.00, and she indicated that she was a manager of National Bridge. [Doc. 53-2]. Six days after executing the Purported Indemnity Agreement, Dena Brown executed a Contract Performance Bond and a Contract Payment Bond, both in the amount of $2,256,939.77, with the North Carolina Department of Transportation ("NCDOT"), and she indicated that she was a manager of National Bridge. [Doc. 53-3]. In January of 2020, William H. West, III and William H. West, IV witnessed Dena Brown sign a Performance and Indemnity Bond and a Payment Bond, both in the amount of $2,797,679.47, with the South Carolina Department of Transportation ("SCDOT") as a manager of National Bridge. [Doc. 53-6].

According to William H. West, III and William H. West, IV, prior to issuing the bonds, the "Plaintiff had undergone underwriting of [National Bridge], including but not limited to, upon information and belief, reviewing and/or receiving a copy of [National Bridge's] operating agreement and/or information concerning signing authority for [National Bridge]." [West, IV Dec., Doc. 50 at ¶ 7; Amended West, III Dec., Doc. 51 at ¶ 7]. According to Kathleen Maloney, the Director of Surety Claims for the Plaintiff, the Plaintiff had "never received and/or had notice of the terms of National Bridge's

purported Operating Agreement," and Defendant National Bridge had "never communicated any limitations whatsoever on the authority of Dena Brown or any other representative/agent to act on National Bridge's behalf" until the Defendant filed its response to the Plaintiff's Second Motion for Preliminary Injunction on November 28, 2022. [Third Maloney Dec., Doc. 53 at ¶ 3].

The Purported Indemnity Agreement requires the Defendant to indemnify the Plaintiff from all "Loss"[1] and grants the Plaintiff the right, in its sole discretion, to settle any claim against any bond. [Doc. 1-1 at 3]. Paragraph 5 of the Purported Indemnity Agreement further requires Defendant National Bridge to deposit collateral with the Plaintiff. [Doc. 1-1 at 3]. On this point, the Purported Indemnity Agreement states as follows:

> Indemnitors agree to deposit with [the Plaintiff], upon demand, funds, other collateral security acceptable to [the Plaintiff], in an amount as determined by [the Plaintiff] sufficient to discharge any Loss or anticipated Loss. Indemnitors further agree to deposit with [the Plaintiff], upon demand, an amount equal to the value of any assets or Contract funds improperly diverted by any Indemnitor. Sums deposited with [the Plaintiff] pursuant to this paragraph may be used by [the Plaintiff] to pay such claim or be held by [the Plaintiff] as collateral security against any Loss or unpaid premium on any Bond.

---

[1] Regarding "Loss," the Purported Indemnity Agreement provides, in part, that the "[i]ndemnitors' liability to [the Plaintiff] includes all Loss, all payments made, and all actions taken by [the Plaintiff] under the Good Faith belief that [the Plaintiff] is, would be or was liable for the Loss, the amounts paid or the actions taken or that it was necessary or expedient to incur such Loss, make such payments or take such actions, whether or not such liability, necessity or expediency existed." [Doc. 1-1 at 2].

[The Plaintiff] shall have no duty to invest, or provide interest on the collateral. Indemnitors agree that [the Plaintiff] would suffer irreparable damage and would not have an adequate remedy at law if Indemnitors fail to comply with the provisions of this paragraph. Any remaining funds held by [the Plaintiff] after payment of all sums due to [the Plaintiff] under this Agreement shall be returned upon the complete release and/or discharge of [the Plaintiff's] liability under all Bonds. In addition to the foregoing, Indemnitors shall promptly, on [the Plaintiff's] written demand, procure the full and complete discharge of [the Plaintiff] from all Bonds demanded by [the Plaintiff] and all liability in connection with such Bonds. If indemnitors are unable to obtain such discharge within the time demanded, Indemnitors shall promptly deposit with [the Plaintiff] an amount of money that [the Plaintiff] determines is sufficient to collateralize or pay any outstanding bonded obligations, or otherwise make provisions acceptable to [the Plaintiff] for the funding of the bonded obligations.

[Id.].

Paragraph 12 of the Purported Indemnity Agreement further requires the Defendant to provide the Plaintiff access to the Defendant's books and records. [Id. at 4]. This provision states, in pertinent part, as follows:

Indemnitors shall furnish upon demand, and [the Plaintiff] shall have the right of free access to, at reasonable times, the records of Indemnitors including, but not limited to, books, papers, records, documents, contracts, reports, financial information, accounts and electronically stored information, for the purpose of examining and copying them.

[Id.]. Paragraph 25 of the Purported Indemnity Agreement also provides that:

12

Indemnitor shall permit any of [the Plaintiff's] officers, employees, agents or other representatives to visit and inspect upon reasonable notice during business hours any of the locations of Indemnitor (provided that, while a Default exists, [the Plaintiff] may make such visits and inspections at any time without prior notice), to examine and audit all of Indemnitor's Property, books of account, records, reports and other papers, to make copies and extracts therefrom and to discuss its affairs, finances and accounts with its officers, employees and independent certified public accountants. Indemnitors shall incur expenses at the standard rates charged by [the Plaintiff] for such activities when an open claim or default exists. Should [the Plaintiff] deem it necessary to visit and inspect when no claim or default exists, it shall do so at its own expense.

[Id. at 7].

"[A]s additional security to secure the obligations of [National Bridge]," Paragraph 6 of the Purported Indemnity Agreement also assigns the Plaintiff an interest in various property, including, in part, "all monies due or to become due to [Defendant National Bridge] as result of the [Bonded] Contract(s)" and "all supplies, materials, tools, machinery, plant and equipment . . . that may . . . be related to, or in, on or around the work or the work site covered by the Bonds." [Id. at 3]. If the Defendant defaults[2] under the Purported Indemnity Agreement, Paragraph 7 provides that:

_____

[2] The Purported Indemnity Agreement provides numerous circumstances under which the Defendant is in default of the Agreement, including, but not limited to, the following: "(a) a declaration of Contract default by any Obligee; (b) the actual or alleged breach,

13

> [The Plaintiff] shall have the right, in its sole discretion, and without limitation, to . . . (ii) take immediate possession of Contract funds whether earned or unearned, (iii) collect such sums as may be due [National Bridge] and to endorse in the name of [National Bridge], and (iv) collect any negotiable instruments; (e) require any Obligee to withhold payment of Contract funds unless and until [the Plaintiff] consents to its release and/or to direct the payment of said Contract funds to [the Plaintiff] or to its designee . . . ."

[Id. at 3-4]. Moreover, "[a]ll rights and remedies of the [Plaintiff] under [the Purported Indemnity Agreement] shall be cumulative, and the exercise of or failure to exercise any right or remedy shall not be an election of or waiver of any right or remedy." [Id. at 6].

After Dena Brown executed the Purported Indemnity Agreement, the Plaintiff issued surety bonds totaling $54,401,405.02 to Defendant National

---

abandonment, refusal, or inability or failure to perform any Contract; (c) a breach of any provision of this Agreement; (d) failure to make payment of a properly due and owing bill in connection with any Contract; (e) if in the sole opinion of the [Plaintiff], the contract funds to be paid are insufficient to pay the costs of completing any Contract or Contracts; (f) diversion of Contract funds for any Indemnitor's assets to the detriment of Contract obligations or any of [the Plaintiff's] right[s] under this Agreement or at law; (g) any Indemnitor's becoming the subject of any proceeding or agreement of bankruptcy, receivership, insolvency, or creditor assignment, or actually becoming insolvent; . . . (j) any failure of any Indemnitor to perform its obligations under this Agreement in accordance with its terms; (k) if there is any change in any Indemnitor's financial condition which, in [the Plaintiff's] opinion, has or would be reasonably likely to have a material adverse effect with respect to the business, assets, properties, financial condition, stockholders['] equity, contingent liabilities, prospects, material agreements or results of operations of any Indemnitor, Indemnitor's ability to perform its obligations under any Contracts and pay the obligations in accordance with the terms thereof, or the validity or enforceability of this Agreement . . . ." [Doc. 1-1 at 1-2].

Bridge, and Defendant National Bridge used those bonds in relation to contracts for construction projects in North Carolina, South Carolina, and Virginia (the "Bonded Contracts"). [Second Maloney Dec., Doc. 39 at ¶ 2].

In 2019, the Plaintiff began receiving claims against the bonds and notices of the Defendant's alleged breaches under the Bonded Contracts. [Id. at ¶ 3]. On April 12, 2019, the NCDOT notified the Plaintiff that Defendant National Bridge had made "unsatisfactory" progress under a Bonded Contract covered by Bond No. SUR 2001132. [Id.; see also Doc. 39-2]. By January of 2020, the Defendant's subcontractors and suppliers had "asserted claims against [the Plaintiff] under nine of the Bonds in an amount that exceeded $1,000,000." [Second Maloney Dec., Doc. 39 at ¶ 3]. On July 2, 2020, the NCDOT again notified the Plaintiff that the Defendant had made "unsatisfactory" progress under a Bonded Contract covered by Bond No. SUR 0002256. [Id.; see also Doc. 39-3]. On November 23, 2020, the NCDOT declared the Defendant to be in "material breach" under a Bonded Contract covered by Bond No. SUR 2001135, and the Defendant was subsequently removed from the NCDOT's prequalified bidder's list in August of 2021 for withholding payment from a subcontractor or supplier related to a Bonded Contract covered by Bond No. SUR 2001150. [Second Maloney Dec., Doc. 39 at ¶ 3; see also Doc. 39-4; Doc. 39-5].

In September of 2021, Defendant National Bridge advised the Plaintiff that it lacked the financial means to pay its vendors, subcontractors, and employees under Bonded Contracts, thereby exposing the Plaintiff to "Loss." [Second Maloney Dec., Doc. 39, at ¶ 4]. The Defendant informed the Plaintiff that it needed $1.5 million to complete the projects. [Amended Countercl., Doc. 63 at ¶¶ 11-14; see also Doc. 39-9]. According to the Defendant, a representative of the Plaintiff agreed via text message to advance $1.5 million. [Amended Countercl., Doc. 63 at ¶¶ 17-40]. On September 15, 2021, the Plaintiff advanced $750,000 to the Defendant. [Id. at ¶ 23; Second Maloney Dec., Doc. 39 at ¶ 5]. According to the Defendant, the Plaintiff's agents stated on multiple occasions that the Plaintiff would make the second $750,000 advancement. [Amended Countercl., Doc. 63 at ¶¶ 29, 37, 40].

On August 31, 2021, Defendant National Bridge provided the Plaintiff with projects' work-in-progress spreadsheets, balance sheets, and income statements. [West, IV Dec., Doc. 50 at ¶ 21a; Amended West, III Dec., Doc. 51 at ¶ 23a]. On September 1, 2021, Defendant National Bridge provided the Plaintiff with accounts payables aging and accounts receivables aging. [West, IV Dec., Doc. 50 at ¶ 21b; Amended West, III Dec., Doc. 51 at ¶ 23b]. On September 7, 2021, Defendant National Bridge provided the Plaintiff with 1,100 pages of documents, including accounts payables, accounts

16

receivables, open estimates, and job costs for prior and open projects. [West, IV Dec., Doc. 50 at ¶ 21c; Amended West, III Dec., Doc. 51 at ¶ 23c]. Further, according to National Bridge's Amended Counterclaims, on September 17, 2021, National Bridge emailed the Plaintiff a list of checks National Bridge would be disbursing to its vendors and subcontractors, and, on September 23, 2021, National Bridge again emailed the Plaintiff copies of the checks that were disbursed. [Amended Countercl., Doc. 63 at ¶¶ 30-31]. On September 24, 2021, Defendant National Bridge emailed the Plaintiff a Dropbox link to checks, lien waivers, and invoices. [Id. at ¶ 33].

On September 28, 2021, the Plaintiff received notice from the SCDOT that Defendant National Bridge had made unsatisfactory progress under a Bonded Contract covered by Bond No. SUR0002257. [Second Maloney Dec., Doc. 39 at ¶ 6; see also Doc. 39-7]. On October 8, 2021, the Plaintiff received notice from the NCDOT that Defendant National Bridge had made unsatisfactory progress under a Bonded Contract covered by Bond No. SUR2001150. [Second Maloney Dec., Doc. 39 at ¶ 6; see also Doc. 39-8].

On October 22, 2021, Defendant National Bridge provided the Plaintiff with additional accounts payables, accounts receivables, and cash flow and project funding spreadsheets as well as income and expense information for each project. [West, IV Dec., Doc. 50 at ¶ 21d; Amended West, III Dec.,

Doc. 51 at ¶ 23d]. On November 22, 2021, Defendant National Bridge provided the Plaintiff with additional documents with information detailing the progress, start dates, completion dates, needed materials, costs, and any liquidated damages associated with open projects. [West, IV Dec., Doc. 50 at ¶ 21e; Amended West, III Dec., Doc. 51 at ¶ 23e].

On December 9, 2021, the Plaintiff advised the Defendant that it would consider advancing an additional $750,000 to the Defendant if National Bridge, Gemini III Trust, and Gemini IV Trust agreed to certain conditions. [Second Maloney Dec., Doc. 39 at ¶ 6; Doc. 39-9]. The Plaintiff set the following conditions:

> Frankenmuth is immediately provided with the outstanding financial information and is given full and complete access to the Books and Records of National Bridge, Gemini III Trust and Gemini IV Trust.
>
> Frankenmuth is immediately provided with the outstanding project information, is given full and complete access to the records of the projects for which it issued Bonds and will be given unfettered access to the project sites and National Bridge's project management.
>
> National Bridge will notify the Obligees on the Frankenmuth-bonded projects that all contract balances are to be deposited into a designated account (the account information to be provided by Frankenmuth).

18

[Doc. 39-9 at 2]. The Plaintiff further addressed the Defendant's obligation to provide the Plaintiff access to books and records, stating that:

> While Frankenmuth has made repeated requests to National Bridge for its financial and project information, *only limited information has been provided by National Bridge.* During a recently scheduled meeting at National Bridge's office, Frankenmuth was advised that the requested information, which is an obligation of National Bridge to provide, would not be produced until additional funding was received from Frankenmuth.

[Id.] (emphasis added). The Defendant did not satisfy the conditions set forth by the Plaintiff. [Second Maloney Dec., Doc. 39 at ¶ 6].

In a letter dated December 20, 2021, the Plaintiff informed Defendant National Bridge that the Plaintiff had received claims from National Bridge's subcontractors and suppliers in excess of $1,137,528.91. [Id. at ¶ 7; Doc. 39-10 at 2]. The Plaintiff further reminded the Defendant of its obligations under the Purported Indemnity Agreement to deposit collateral and provide access to books and records. [Doc. 39-10 at 2]. The Plaintiff demanded that the Defendant deposit $1,137,528.81[3] in collateral with the Plaintiff and that the Defendant provide "full and complete access to all of the financial

---

[3] The ten cent difference between the $1,137,528.91 stated in the Second Maloney Declaration and the $1,137,528.81 stated in the December 20, 2021 letter is not explained.

19

information and records and the records of all of the projects on which Frankenmuth issued Bonds." [Id. at 2-3].

On December 23, 2021, while the Plaintiff was considering advancing an additional $750,000 to the Defendant, the Plaintiff also sent William H. West, IV a proposed Addendum to the Purported Indemnity Agreement,[4] a copy of the Purported Indemnity Agreement, and a Docusign Certificate of Completion for the Purported Indemnity Agreement. [Third Maloney Dec., Doc. 53 at ¶ 7; see also Doc. 53-10; Doc. 53-11]. William H. West, IV did not execute the Addendum, but no "representative/agent of National Bridge questioned or challenged the fact that National Bridge was bound by the initial Indemnity Agreement." [Third Maloney Dec., Doc. 53 at ¶ 7]. The Plaintiff ultimately did not advance an additional $750,000 to the Defendant. [Second Maloney Dec., Doc. 39 at ¶ 6].

On January 3, 2022, William H. West, IV emailed a representative of the Plaintiff and asserted that the Plaintiff breached its agreement to advance $1.5 million to Defendant National Bridge. [Doc. 70-4]. In a letter dated January 7, 2022, Kathleen Maloney asserted that the Plaintiff had no obligation to advance additional funds to the Defendant. [Id.; see also Doc.

---

[4] The Proposed Addendum would have added William H. West, IV as a personal indemnitor on construction projects in Virginia. [Doc. 53-10].

39-11 at 1]. Kathleen Maloney also informed Defendant National Bridge that the Plaintiff had incurred losses or anticipated losses under the Bonded Contracts in excess of $1,409,932.78. [Doc. 39-11 at 5]. The Plaintiff demanded that the Defendant deposit "$1,409,932.78 in acceptable collateral with Frankenmuth" and further demanded "immediate access to National Bridge's books, records, etc. for examination, inspection, and auditing." [Id. at 6].

According to Kathleen Maloney, as of October 31, 2022, the Defendant has been declared to be in default under Bonded Contracts totaling $31,321,509.50.[5] [Second Maloney Dec., Doc. 39 at ¶ 8]. According to William H. West, III and William H. West, IV, however, Defendant National Bridge "completed all but one [project] on-time and was not defaulted from a single project[.]" [West, IV Dec., Doc. 50 at ¶ 18; Amended West, III Dec., Doc. 51 at ¶ 20].

The Plaintiff directed the NCDOT and the SCDOT to deposit proceeds under at least some of the Bonded Contracts with the Plaintiff. [See Second Maloney Dec., Doc. 39 at ¶¶ 8-9; see also West, IV Dec., Doc. 50 at ¶¶ 16-

---

[5] The Plaintiff has submitted a list of the Bonded Contracts, and their respective penal sums, under which Defendant National Bridge has voluntarily defaulted or the owner or obligee has declared Defendant National Bridge to be in default. [Second Maloney Dec., Doc. 39 at ¶ 8]. The owner or obligee under each of these Bonded Contracts is either the NCDOT or W.C. English, Incorporated. [Id.].

17; Amended West, III Dec., Doc. 51 at ¶¶ 18-19]. When discussing how to direct contract payments to the Plaintiff, one NCDOT employee emailed other NCDOT employees in December of 2021 that "National Bridge has not defaulted," that the NCDOT had received multiple letters about "all of National Bridge Builders projects in which Frankenmuth is the surety," and that the Plaintiff was requesting payments to be sent to it, rather than to the Defendant. [Doc. 70-8]. The NCDOT determined that "checks [would] be made payable to National Bridge and mailed to Frankenmuth."[6] [Id. at 2].

On March 23, 2022, the Plaintiff also sent a letter to one company with a claim against a Bonded Project, and Kathleen Maloney noted that it was the Plaintiff's "position that National Bridge, its representatives and related entities have misappropriated and misused contract funds . . . ." [Doc. 70-16]. Kathleen Maloney testified that she did not contact payees "to verify the checks and payments that National Bridge told us that they issued from the funds that they got from Frankenmuth." [Doc. 70-17]. The Plaintiff also

---

[6] Similarly, the Plaintiff discussed directing contract payments to the Plaintiff with the Assistant Chief Counsel of the SCDOT. [See Doc. 70-5]. On February 4, 2022, the Assistant Chief Counsel sent an email about one specific project and stated, in part, "[t]o me, [it] seems like Frankenmuth is demanding the entire balance for payments because 1.25% is owed. South Carolina law requires breaches of contract to be 'material.' Our courts have defined 'material' to mean 'substantial.' . . . Help me understand how/why Frankenmuth is entitled to 100% when it is only owed 1.25% on this project?" [Id.]. From the documents submitted by the parties, it is unclear which specific project this email is referring to or whether the SCDOT did, in fact, direct contract payments related to this project to the Plaintiff.

removed $650,000 in Defendant National Bridge's assets from a project in McDowell County, North Carolina. [West, IV Dec., Doc. 50 at ¶¶ 14-15; Amended West, III Dec., Doc. 51 at ¶¶ 16-17].

After accounting for proceeds under the Bonded Contracts, the Plaintiff estimates that it will incur an anticipated "Loss" of more than $15,910,811.76. [Second Maloney Dec., Doc. 39 at ¶ 8]. The Plaintiff has already paid net "Loss" totaling $2,226,339.05 relative to the Bonded Contracts, and the Plaintiff estimates that it will incur additional "Loss" of $13,684,472.71.[7] [Id.]. Despite multiple requests, the Defendant has not deposited any collateral with the Plaintiff. [Id. at ¶ 7; Third Maloney Dec., Doc. 53 at ¶ 9].

On August 5, 2022, the Plaintiff served requests for production of documents on the Defendant under Federal Rule of Civil Procedure 34. [Third Maloney Dec., Doc. 53 at ¶ 10]. In November of 2022, the Defendant National Bridge sent the Plaintiff a sharefile link to 2.78 gigabytes of data, including 2,110 files. [Id.; see also West, IV Dec., Doc. 50 at ¶ 20; Amended West, III Dec., Doc. 51 at ¶ 22]. This data included 1,149 single-image JPEG files without descriptions as well as many files containing the same

---

[7] The Plaintiff has also submitted a list of the Bonded Contracts under which the Plaintiff has already paid net "Loss" totaling $2,226,339.05. [Second Maloney Dec., Doc. 39 at ¶ 8]. Further, to estimate an additional, anticipated "Loss" of $13,684,472.71, the Plaintiff has submitted a table itemizing the estimated costs of completion, the remaining contract balances, and the resulting anticipated loss under some of the Defendant's Bonded Contracts with the NCDOT. [Id.].

23

information that the Defendant produced in September of 2021. [Third Maloney Dec., Doc. 53 at ¶ 10]. Further, Defendant National Bridge's document production did not include National Bridge's Operating Agreement or account information detailing the receipt and disbursement of the proceeds of the Bonded Contracts. [Id.].

William H. West, III and William H. West, IV state that "[t]he scope of information provided to [the] Plaintiff has not been limited to financials associated with the $750,000 payment made by [the] Plaintiff to [National Bridge]. [National Bridge] has provided [the] Plaintiff financials associated with all Frankenmuth-NBB Projects." [West, IV Dec., Doc. 50 at ¶ 21g; Amended West, III Dec., Doc. 51 at ¶ 23g]. According to Kathleen Maloney, as of December 5, 2022, Defendant National Bridge has "ignored [the Plaintiff's] request for access to any other relevant documents/information that were not included in National Bridge's document production." [Third Maloney Dec., Doc. 53 at ¶ 10].

## IV. DISCUSSION

### A. Plaintiff's Motion for Preliminary Injunction

The Plaintiff seeks a preliminary injunction compelling Defendant National Bridge to deposit collateral with the Plaintiff in the amount of $15,910,811.76 and to allow the Plaintiff access to Defendant National

24

Bridge's books, records, and accounts. [Doc. 37]. The relief that the Plaintiff seeks would provide remedies under Count One and Count Two of the Plaintiff's Complaint. In Count One, the Plaintiff alleges that Defendant National Bridge's "failure to deposit the demanded collateral with [the Plaintiff] constitutes a material breach of Paragraph 5 of the [Purported] Indemnity Agreement," and the Plaintiff seeks a judgement compelling the Defendant to deposit collateral with the Plaintiff. [Doc. 1 at ¶¶ 49-63]. In Count Two, the Plaintiff alleges that Defendant National Bridge's "failure to make its books, records, etc. available for examination, copying and/or auditing constitutes a material breach of Paragraphs 12 and 25 of the [Purported] Indemnity Agreement," and the Plaintiff seeks a judgment compelling the Defendant to make its books and records available to the Plaintiff. [Id. at ¶¶ 64-76]. Accordingly, the Court will address the Plaintiff's Second Motion for Preliminary Injunction only with respect to the Plaintiff's claims that Defendant National Bridge has breached the collateral security and financial records provisions of the Purported Indemnity Agreement. See First Nat'l Ins. Co. of Am. v. Sappah Bros. Inc., 771 F. Supp. 2d 569, 571-72 (E.D.N.C. 2011) ("[T]he court notes that it is not evaluating First National's likelihood of success on each claim alleged. Rather, because First National seeks preliminary injunctive relief based solely on alleged breach of the

collateral security and financial records provisions of the indemnity agreement, the court analyzes only the claim for breach of contract seeking specific performance of those contractual provisions.").

## 1. Likelihood of Success on the Merits

As a federal court sitting in diversity, this Court must apply the substantive law of the forum state, including its choice of law rules. Colgan Air, Inc. v. Raytheon Aircraft Co., 507 F.3d 270, 275 (4th Cir. 2007). For contractual claims, North Carolina courts apply the law of the place where the contract was made, see Norman v. Tradewinds Airlines, Inc., 286 F. Supp. 2d 575, 584 (M.D.N.C. 2003), but where the contracting parties "have agreed that a given jurisdiction's substantive law shall govern the interpretation of the contract, such a contractual provision will be given effect," Tanglewood Lane Co. v. Byrd, 299 N.C. 260, 262, 261 S.E.2d 655, 656 (1980). However, the Fourth Circuit has instructed that choice of law provisions are "waivable, not jurisdictional . . . ." Wiener v. AXA Equitable Life Ins. Co., -- F.4th --, 2023 WL 329317, at *3 (4th Cir. Jan. 20, 2023). Therefore, a party waives choice of law "by affirmatively litigating under the substantive law" of another jurisdiction. Id. at *3-4 (holding that defendant waived the application of Connecticut law where its "answer, motion for summary judgment, trial brief, proposed jury instructions, and post-trial

motion to dismiss all either assumed North Carolina law applied or explicitly cited North Carolina law as governing").

The Purported Indemnity Agreement provides that "[t]his agreement and all matters arising out of or relating to this agreement, and all related agreements and documents, shall be governed by and construed in accordance with the substantive laws of the state of Maine." [Doc. 1-1 at 7]. In the Defendant's Response in Opposition to the Plaintiff's Second Motion for Preliminary Injunction, Defendant National Bridge argues, for the first time, that the substantive laws of Maine apply to matters relating to the Purported Indemnity Agreement. [Doc. 48 at 25]. However, the Defendant cites to North Carolina contract law and does not cite to or explain how Maine contract law applies to the facts of this case. [Id. at 9, 18-19]. Therefore, because the Defendant has litigated the Plaintiff's Second Motion for Preliminary Injunction under North Carolina law, the Court finds that the Defendant has waived the application of Maine law, and the Court will apply North Carolina law to determine whether the Plaintiff is likely to succeed on the merits of its claims that the Defendant breached the collateral security and financial records provisions of the Purported Indemnity Agreement.[8]

---

[8] The Court notes that, with regard to the issues raised in this matter, Maine contract law does not appear to substantively differ from North Carolina contract law. See Tobin v.

## a.     Formation of the Purported Indemnity Agreement

In the Defendant's Response in Opposition to the Plaintiff's Second Motion for Preliminary Injunction, Defendant National Bridge argues, for the first time, that the Purported Indemnity Agreement is invalid.  [Doc. 48 at 9]. Specifically, the Defendant asserts that the Purported Indemnity Agreement is invalid because it was not signed by both of National Bridge's Managers— William H. West, III and William H. West, IV—as is required by National Bridge's Operating Agreement.  [Id. at 12].[9]

_____

Barter, 2014 Me 51, ¶¶ 9-10, 89 A.3d 1088, 1091-92 ("To demonstrate that the parties had a legally binding contract, the plaintiff must establish that there was a meeting of the minds between the parties . . . In order to obtain relief for a breach of contract, the plaintiff must also demonstrate that the defendant breached a material term of the contract, and that the breach caused the plaintiff to suffer damages.") (internal quotation marks and alterations omitted); see also Steelstone Indus., Inc. v. N. Ridge Ltd. Partnership, 1999 Me 132, ¶ 13, 735 A.2d 980, 983 ("Apparent authority is authority which, though not actually granted, the principal knowingly permits the agent to exercise or which he holds him out as possessing.") (internal quotation marks omitted); Gilman v. F.O. Bailey Carriage Co., 127 Me 91, 141 A. 321, 323 (1928) (holding that where a principal "after knowledge of the facts attending the transaction, receives and retains the benefit of it without objection, it thereby ratifies the unauthorized act and estops itself from repudiating it").  Therefore, the Court's analysis and conclusion would be the same if it were to apply Maine contract law.

[9] In addition to the Defendant's argument that the Purported Indemnity Agreement was not executed by William H. West, III and William H. West, IV, the Defendant further states the following about the Purported Indemnity Agreement: "(1) The Purported Indemnity Agreement is drafted by Plaintiff; (2) execution of the Purported Indemnity Agreement was not before a notary or e-notary; (3) The Purported Indemnity Agreement appears to be e-signed and fails to provide the entire block chain associated with the e-signature(s); (4) the execution page contains no witnesses . . . ."  [Doc. 48 at 9].  It is unclear to the Court whether the Defendant offers these statements as additional arguments for why the Purported Indemnity Agreement is invalid and, if so, why these observations render the Purported Indemnity Agreement invalid.

Under North Carolina law, "a valid contract exists only where there has been a meeting of the minds as to all essential terms of the agreement." Northington v. Michelotti, 121 N.C. App. 180, 184, 464 S.E.2d 711, 714 (1995). Moreover, a principal is bound to contracts made by its agents in three situations: "when the agent acts within the scope of his or her actual authority; when the agent acts within the scope of his or her apparent authority, and the third person is without notice that the agent is exceeding actual authority; and when a contract, although unauthorized, has been ratified." Wachovia Bank of North Carolina, N.A. v. Bob Dunn Jaguar, Inc., 117 N.C. App. 165, 170, 450 S.E.2d 527, 531 (1994).

Apparent authority exists where "the principal has held the agent out as possessing" authority or the principal has "permitted the agent to represent that he possesses" authority. Id. at 171, 450 S.E.2d at 531. "Whether the agent acts within the apparent scope of his authority is determined by what the principal does, not by the unauthorized acts and contentions of the agent." Id. at 172, 450 S.E.2d at 531-32.

Further, a principal ratifies the unauthorized acts of its agent where:

> [T]he party claiming ratification [proves] (1) that at the time of the act relied upon, the principal had full knowledge of all material facts relative to the unauthorized transaction . . . and (2) that the principal had signified his assent or his intent to ratify by word

> or by conduct which was inconsistent with an intent
> not to ratify.

Id. at 173, 450 S.E.2d at 532. A principal "must ratify the whole of his agent's unauthorized act or not at all. He cannot accept its benefits and repudiate its burdens." Snyder v. Freeman, 300 N.C. 204, 213-14, 266 S.E.2d 593, 600 (1980) (holding that "[t]he corporation, by accepting the benefits of the transaction intended to and did, in fact, ratify the agreement. It thereby became bound by the agreement").

Here, the Purported Indemnity Agreement was executed by a user with the email address dena@nationalbridgebuilders.us and who electronically signed the Purported Indemnity Agreement as "William H. West." [Doc. 53-10 at 11-12]. The Defendant's Operating Agreement states that William H. West, III and William H. West, IV shall serve as managers, the consent of one manager is needed to bind National Bridge to contracts involving amounts under $10,000, and the consent of both managers is needed to bind National Bridge to contracts involving amounts over $10,000. [See Doc. 50-1 at 8]. Neither William H. West, III nor William H. West, IV executed, reviewed, or received the Purported Indemnity Agreement, [West, IV Dec., Doc. 50 at ¶¶ 9-11; Amended West, III Dec., Doc. 51 at ¶¶ 9-11]. Accordingly, it appears that the Purported Indemnity Agreement was not executed on behalf of the Defendant by someone with actual authority.

30

The question here is whether the Plaintiff is likely to succeed in showing that the Purported Indemnity Agreement was executed by one with apparent authority. The parties disagree as to whether the Plaintiff received or had notice of the terms of the Defendant's Operating Agreement before November 28, 2022. [Third Maloney Dec., Doc. 53 at ¶ 3; West, IV Dec., Doc. 50 at ¶; Amended West, III Dec., Doc. 51 at ¶ 7]. However, it is uncontroverted that the Purported Indemnity Agreement was executed by Dena Brown, and the Defendant has, until now, regularly held her out as a manager and as having the authority to bind the Defendant to contracts involving amounts over $10,000. For example, in 2018, Defendant National Bridge named Dena Brown as the corporate secretary and the *only* company official in National Bridge's Limited Liability Company Annual Report. [Doc. 53-1]. Five days before executing the Purported Indemnity Agreement, Dena Brown, acting on behalf of the Defendant, also executed a Letter of Intent to Perform as a Subcontractor with a total commitment amount of $24,355.00. [Doc. 53-2]. Six days after executing the Purported Indemnity Agreement, Dena Brown, again acting on behalf of the Defendant, executed a Contract Performance Bond and a Contract Payment Bond, both in the amount of $2,256,939.77, with the NCDOT. [Doc. 53-3]. When executing these documents, Dena Brown listed her title as "manager" of National

Bridge. [Doc. 53-2; Doc. 53-3]. Moreover, both William H. West, III and William H. West, IV witnessed Dena Brown execute, as a manager, a Performance and Indemnity Bond and a Payment Bond, both in the amount of $2,797,679.47, with the SCDOT. [Doc. 53-6]. As such, the Plaintiff is likely to succeed in showing that Dena Brown had apparent authority to execute the Purported Indemnity Agreement on behalf of the Defendant.

Further, even if Dena Brown lacked apparent authority to bind Defendant National Bridge to the Purported Indemnity Agreement, the Plaintiff is likely to succeed in showing that Defendant National Bridge ratified the Purported Indemnity Agreement. After Dena Brown executed the Purported Indemnity Agreement, the Plaintiff issued surety bonds totaling $54,401,405.02 for Defendant National Bridge. [Second Maloney Dec., Doc. 39 at ¶ 2]. On December 20, 2021, the Plaintiff sent a letter to the Defendant stating that the parties executed the Purported Indemnity Agreement on August 22, 2018 and, under that agreement, the Defendant was obligated to, upon demand, deposit collateral and provide free access to books and records. [Doc. 39-10]. Three days later, while the parties were negotiating an advancement of additional funds to the Defendant, the Plaintiff sent William H. West, IV a copy of the Purported Indemnity Agreement along with the certification showing its execution via Docusign. [Third Maloney Dec.,

Doc. 53 at ¶ 7; see also Doc. 53-10; Doc. 53-11]. Having such full knowledge, no representative of National Bridge disaffirmed the contract, or questioned its execution, until Defendant National Bridge filed its Response in Opposition to the Plaintiff's Second Motion for Preliminary Injunction. [Third Maloney Dec., Doc. 53 at ¶¶ 7-8]. Lastly, without the Purported Indemnity Agreement, the Defendant would likely not have been able to secure the bonds, and without the bonds, the Defendant would likely not have been able to secure the construction contracts. N.C. Gen. Stat. § 44A-26 (requiring construction contracts for any one project exceeding $300,000 to be bonded). The Plaintiff is likely to succeed in showing that the Defendant received the benefit of the Purported Indemnity Agreement and thus ratified its execution, even if such may have been technically defective.

Therefore, based on the record currently before the Court, the Plaintiff is likely to succeed in showing that the parties entered into and are bound by the Purported Indemnity Agreement.[10]

---

[10] At this point in the Court's analysis, the Court does not address the Defendant's Counterclaims for breach of contract, breach of implied covenant of good faith and fair dealing, unfair and deceptive trade practices, fraud in the inducement, tortious interference with contract, and defamation because the Court finds that those Counterclaims are unrelated to the *formation of the Purported Indemnity Agreement.* Rather, the Defendant asserts Counterclaims (1) related only to the Plaintiff's alleged promise to advance $1.5 million to the Defendant or (2) related to actions or statements occurring *after* the formation of the Purported Indemnity Agreement. [See Amended Countercl., Doc. 63 at ¶¶ 51-114].

### b. Breach of the Purported Indemnity Agreement

Under North Carolina law, "[t]he elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." Poor v. Hill, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000) (citation omitted). "To obtain the remedy of specific performance for the breach, the plaintiff 'must show the existence of a valid contract, its terms, and either full performance on his part or that he is ready, willing and able to perform.'" First Nat'l Ins. Co. of Am., 771 F. Supp. 2d at 572 (quoting Ball v. Maynard, 184 N.C. App. 99, 107, 645 S.E.2d 890, 896 (2007)). Having already determined that the Plaintiff is likely to succeed in showing the existence of a valid contract, the Court now turns to the question of whether the Plaintiff is likely to succeed in showing that the Defendant breached the collateral security and financial records provisions of the Purported Indemnity Agreement.

The collateral security provision of the Purported Indemnity Agreement requires the Defendant "to deposit with [the Plaintiff], upon demand, funds, other collateral security acceptable to [the Plaintiff], in an amount as determined by [the Plaintiff] sufficient to discharge any Loss or anticipated Loss." [Doc. 1-1 at 3]. The Plaintiff has presented a letter dated December

34

20, 2021, in which it demanded $1,137,528.81 in collateral from the Defendant, [Doc. 39-10], and a letter dated January 7, 2022, in which it demanded $1,409,932.78 in collateral from the Defendant, [Doc. 39-11]. The Plaintiff has further presented multiple declarations from Kathleen Maloney, who stated that, despite repeated demands from the Plaintiff, the Defendant has "failed to deposit a penny of collateral." [Second Maloney Dec., Doc. 39 at ¶ 7; Third Maloney Dec., Doc. 53 at ¶ 9].

Defendant National Bridge argues that the Plaintiff is not likely to succeed on the merits because the Plaintiff's failure to advance an additional $750,000 to the Defendant and the Plaintiff's interception of contract payments owed to the Defendant caused the Defendant to default under the Bonded Contracts. [Doc. 48 at 19; see also Amended Countercl., Doc. 63 at ¶¶ 45-49, 63, 66-67; Doc. 24 at 11-13]. The Defendant, however, cites to no provision in the Purported Indemnity Agreement requiring the Plaintiff to advance funds to the Defendant. Rather, the Purported Indemnity Agreement requires the Defendant to deposit collateral with the Plaintiff upon demand. [Doc. 1-1 at 3]. The Purported Indemnity Agreement also gives the Plaintiff the right to take possession of earned or unearned contract payments due to the Defendant if the Defendant is in default, as defined by the Purported Indemnity Agreement. [Id. at 3-4]. The Plaintiff's right to

35

collateral and right to take possession of contract payments are "cumulative, and the exercise of . . . any right or remedy shall not be an election of or waiver of any [other] right or remedy." [Id. at 6]. The Defendant's assertions on these two points are irrelevant to the Defendant's obligation to deposit collateral preliminarily under the Purported Indemnity Agreement's collateral security provision. See First Nat'l Ins. Co. of Am., 771 F. Supp. 2d at 574 (holding, in part, that "while the issue of whether [surety] acted in good faith may be relevant to whether defendants ultimately are liable to [surety] for indemnification under their agreement, it is irrelevant to whether defendants are required to post collateral security preliminarily"). Accordingly, the Plaintiff has demonstrated that it is likely to succeed on its claim that Defendant National Bridge breached the Purported Indemnity Agreement's collateral security provision.

The Purported Indemnity Agreement further provides that the Plaintiff "shall have the right of free access to, at reasonable times, the records of [the Defendant] including, but not limited to, books, papers, records, documents, contracts, reports, financial information, accounts and electronically stored information, for the purpose of examining and copying them." [Doc. 1-1 at 4]. Here, the Defendant has provided the Declarations of William H. West, III and William H. West, IV, who state that Defendant

National Bridge provided the Plaintiff with accounts payables aging, accounts receivables aging, open estimates, job costs, checks, lien waivers, and invoices in September of 2021. [West, IV Dec., Doc. 50 at ¶ 21; Amended West, III Dec., Doc. 51 at ¶ 23; Amended Countercl., Doc. 63 at ¶¶ 30-33]. In October and November of 2021, Defendant National Bridge provided the Plaintiff with additional accounts payables, accounts receivables, cash flow and project funding spreadsheets, and income and expense information as well as documents detailing the progress, start dates, completion dates, needed materials, costs, and liquidated damages associated with open projects. [West, IV Dec., Doc. 50 at ¶ 21; Amended West, III Dec., Doc. 51 at ¶ 23]. In November of 2022, Defendant National Bridge provided the Plaintiff with a sharefile link to 2,110 files. [West, IV Dec., Doc. 50 at ¶ 20; Amended West, III Dec., Doc. 51 at ¶ 22; Third Maloney Dec., Doc. 53 at ¶ 10].

However, the Defendant's document production did not include "National Bridge's Operating Agreement or any other document that identifies National Bridge's agents and/or articulates their authority to act on National Bridge's behalf [or] any account information detailing National Bridge's receipt and disbursement of the proceeds of the Bonded Contracts." [Third Maloney Dec., Doc. 53 at ¶ 10]. Further, many of the 2,110 files

included in the Defendant's November 2022 document production do not contain updated information. [Id.]. Instead, many of those documents contain the same information provided in September of 2021. [Id.]. The Defendant "has also ignored [the Plaintiff's] request for access to any other relevant documents/information that were not included in National Bridge's document production." [Id.]. Accordingly, despite the fact that the Defendant has already produced numerous documents, the Plaintiff has demonstrated that it is likely to succeed on its claim that the Defendant breached the Purported Indemnity Agreement's financial records provision by failing to provide the Plaintiff with *full* access to *all* of the books and records requested.

### c. Amount of Collateral Sought by the Plaintiff

Defendant National Bridge also argues that the Plaintiff has not demonstrated that it is entitled to the specific amount of collateral that it seeks. [Doc. 48 at 13-18; see also Doc. 24 at 9-10]. Specifically, the Defendant asserts that the amount of collateral requested by the Plaintiff does not include contract payments the Plaintiff intercepted directly from project owners and that the Plaintiff's demand improperly includes attorney's fees. [Doc. 48 at 14]. However, the Plaintiff has presented an itemized list

38

showing that, following the Defendant's defaults under Bonded Contracts,[11] the Plaintiff has already paid net "Loss" totaling $2,226,339.05. [Second Maloney Dec., Doc. 39 at ¶ 8]. The Plaintiff has also presented itemized estimates showing that, *after accounting for intercepted payments* under Bonded Contracts, the Plaintiff estimates that it will incur total anticipated "Loss" of more than $15,910,811.76. [Id.]. Further, the Purported Indemnity Agreement provides that the Defendant is obligated to deposit collateral with the Plaintiff, upon demand, "in an amount *as determined by [the Plaintiff]* sufficient to discharge *any Loss or anticipated Loss*[,]" [Doc. 1-1 at 3], and

---

[11] In their Declarations, William H. West, III and William H. West, IV state that the "Plaintiff, by way of Declaration of Kathleen Maloney, has claimed that [National Bridge] defaulted [on] projects," but Defendant National Bridge "completed all but one [project] on-time and was not defaulted from a single project[.]" [West, IV Dec., Doc. 50 at ¶ 18; Amended West, III Dec., Doc. 51 at ¶ 20]. In support of this statement, the Defendant submitted 146 pages of what William H. West, III and William H. West, IV describe as "project closeout documentation." [West, IV Dec., Doc. 50 at ¶ 18; Doc. 50-2; Amended West, III Dec., Doc. 51 at ¶ 20; Doc. 51-2]. The Court finds the Defendant's statement that it "*was not defaulted* from a single project[,]" [West, IV Dec., Doc. 50 at ¶ 18; Amended West, III Dec., Doc. 51 at ¶ 20] (emphasis added) to be entirely inconsistent with the Defendant's argument that the "Plaintiff's failures resulted in . . . [National Bridge] *defaulting, for the first time in its existence,* on various NC and SC DOT projects[,]" [Doc. 48 at 19] (emphases added). Further, although Kathleen Maloney listed specific Bonded Contracts under which the Defendant was declared to be in default and listed specific projects under which the Plaintiff has already paid $2,226,339.05 in "Loss," [Second Maloney Dec., Doc. 39 at ¶ 8], many of those projects are seemingly not addressed in the "project closeout documentation" submitted by the Defendants, [see Doc. 50-2; Doc. 51-2]. Rather, the "project closeout documentation" seems to largely consist of final, and, in many cases, only monthly contract estimates for entirely separate projects in entirely different counties, with only a fraction of those documents providing *final* project information for the Bonded Contracts or projects cited by the Plaintiff.

39

the Purported Indemnity Agreement includes attorney's fees in the definition of "Loss," [id. at 2]. Under the Purported Indemnity Agreement, the Defendant agreed to the Plaintiff demanding collateral in an amount based on a good faith estimation by the Plaintiff. The Defendant has presented nothing to show that the Plaintiff's estimation is either erroneous or in bad faith. Accordingly, the Plaintiff has demonstrated that it is entitled to $15,910,811.76 in collateral under the terms of the Purported Indemnity Agreement.[12]

## 2. Irreparable Harm

The Supreme Court's "frequently reiterated standard requires [a plaintiff] seeking preliminary relief to demonstrate that irreparable injury is likely in the absence of an injunction." Winter, 555 U.S. at 22, 1295 S. Ct. at 375. "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of an injunction are not enough." Roe v. Dep't of Def., 947 F.3d 207, 228 (4th Cir. 2020) (quoting Di Biase v. SPX

---

[12] The Court notes that although the Plaintiff's Second Motion for Preliminary Injunction seeks an injunction compelling the Defendant to deposit $15,910,811.76 in collateral, [Doc. 37], the Plaintiff's Complaint seeks a judgment compelling the Defendant to deposit only $2,383,291.00 in collateral, [Doc. 1 at ¶ 63]. This discrepancy does not change the Court's analysis because the Plaintiff has presented evidence that (1) it has the right under the Purported Indemnity Agreement to determine an acceptable amount of collateral, [Doc. 1-1 at 3], and (2) the Plaintiff's anticipated "Loss" now exceeds $15,910,811.76, [Second Maloney Dec., Doc. 39 at ¶ 8].

Corp., 872 F.3d 224, 230 (4th Cir. 2017)) (internal quotation marks and alteration omitted).

"Courts routinely recognize that a surety's loss of its right to collateralization cannot be adequately remedied through monetary damages." First Nat'l Ins. Co. of Am., 771 F. Supp. 2d at 574 (internal citation and quotation marks omitted); Frankenmuth Mutual Ins. Co. v. Caden Constr Co., No. 1:19-cv-01125, 2020 WL 2322726, at *4 (M.D.N.C. May 11, 2020); Int'l Fidelity Ins. Co v. Waterfront Grp. N.C., LLC, No. 3:11-cv-00116, 2011 WL 4715155, at *4 (W.D.N.C. Oct. 6, 2011); Great Am. Ins. Co. v. Global Team Elec., LLC, No. 3:20-cv-00218-RJC-DSC, 2020 WL 2527034, at *6 (W.D.N.C. May 18, 2020). "This is so because the surety holds a bargained-for right to collateral security and, without enforcement of such right, assumes the risk of becoming a general unsecured creditor and of being unable to collect a subsequent judgment in its favor." Great Am. Ins. Co., 2020 WL 2527034, at *6 (internal citation and quotation marks omitted). Without preliminary relief, the collateral security provision of the Purported Indemnity Agreement is reduced to a nullity.

Here, the Purported Indemnity Agreement provides that the Defendant must deposit collateral with the Plaintiff upon demand and that the Plaintiff "would *suffer irreparable damage and would not have an adequate remedy*

41

*at law* if Indemnitors fail to comply with the [collateral security provision]." [Doc. 1-1 at 3] (emphasis added). The Plaintiff has presented evidence that the Defendant has been declared to be in default under multiple Bonded Contracts, and the Plaintiff estimates that its total exposure to anticipated "Loss," after intercepting proceeds from the Bonded Contracts, now exceeds $15,910,811.76. [Second Maloney Dec., Doc. 39 at ¶ 8]. Accordingly, the Plaintiff has demonstrated that, in the absence of injunctive relief compelling the Defendant to deposit $15,910,811.76 in collateral, it risks becoming "a general unsecured creditor" and would, therefore, suffer irreparable harm. Great Am. Ins. Co., 2020 WL 2527034, at *6.

Further, absent *full* access to books and records, a surety is "in the dark as to [its] chances of successful performance of the contract and ha[s] no idea whether and [to] what extent [an indemnitor] can satisfy their indemnity obligation." Id. at *7 (internal citation and quotation marks omitted). Kathleen Maloney states that the Plaintiff needs full access to the Defendant's books and records to ascertain and mitigate any further exposure to "Loss" under the Bonded Contracts. [Second Maloney Dec., Doc. 39 at ¶¶ 8-9]. Accordingly, the Plaintiff has also demonstrated that it would suffer irreparable harm in the absence of an injunction compelling Defendant National Bridge to provide access to its books and records.

42

### 3. Balance of Equities

A plaintiff seeking a preliminary injunction must establish that the balance of the equities tips in its favor. <u>Winter</u>, 555 U.S. at 20, 129 S. Ct. at 374. "[I]n each case the Court 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" <u>Armento v. Asheville Buncombe Cmty. Christian Ministry, Inc.</u>, No. 17-cv-00150-MR-DLH, 2017 WL 3838638, at *1 (W.D.N.C. Sept. 1, 2017) (Reidinger, J.) (quoting <u>Amoco</u>, 480 U.S. at 542).

Here, "[a]bsent preliminary relief enforcing the collateral security provision, [the Plaintiff] would bear the entire loss on the bond claims without being collateralized, a right to which it explicitly bargained in the [I]ndemnity [A]greement." <u>Great Am. Ins. Co.</u>, 2020 WL 2527034, at *7 (internal citation and quotation marks omitted). An injunction compelling Defendant National Bridge to deposit collateral with the Plaintiff and provide the Plaintiff access to the Defendant's books and records would merely "require [the Defendant] to perform as [it] contractually-obligated [itself] to do." <u>Int'l Fidelity Ins. Co.</u>, 2011 WL 4715155, at *5; <u>see</u> <u>also</u> <u>Great Am. Ins. Co.</u>, 2020 WL 2527034, at *7. Further, to minimize the potential financial harm to the Defendant, the

43

Purported Indemnity Agreement provides that "[a]ny remaining funds held by [the Plaintiff] after payment of all sums due to [the Plaintiff] . . . shall be returned [to the Defendant] upon the complete release and/or discharge of [the Plaintiff's] liability under all Bonds."  [Doc. 1-1 at 3]; see also Int'l Fidelity Ins. Co., 2011 WL 4715155, at *5; First Nat'l Ins. Co. of Am., 771 F. Supp. 2d at 575.  Accordingly, the balance of the equities is in favor of the Plaintiff.

### 4. Public Interest

A plaintiff seeking a preliminary injunction must establish that the granting of an injunction is in the public interest.  Winter, 555 U.S. at 20, 129 S. Ct. at 374.  "The public has an interest in ensuring that contracts are enforced."  Great Am. Ins. Co., 2020 WL 2527034, at *7 (quoting UBS PaineWebber, Inc. v. Aiken, 197 F. Supp. 2d 436, 448 (W.D.N.C. 2002)).  "Enforcing the collateral security provision of an indemnity agreement in the construction setting serves an important public interest: to encourage sureties to continue to provide bonds for public construction contracts."  Id. (quoting First Nat'l Ins. Co. of Am., 771 F. Supp. 2d at 576).  Therefore, the issuance of a preliminary injunction in this case is in the public interest.

### B. Defendant's Motion for Preliminary Injunction

The Defendant seeks an injunction estopping the Plaintiff from seizing the Defendant's assets, enforcing UCC filings granting the Plaintiff rights to

44

the Defendant's receivables and collateral, and taking any further action that Plaintiff claims to arise from the Purported Indemnity Agreement. [Doc. 69 at 1]. The Defendant also seeks an injunction ordering the Plaintiff to return assets seized from the Defendant or estopping the Plaintiff from distributing those assets during the pendency of this action. [Id.]. The Defendant asserts that it is likely to succeed on the merits of its Counterclaims for breach of contract, breach of implied covenant of good faith and fair dealing, unfair and deceptive trade practices, fraud in the inducement, tortious interference with contract, and defamation. [Doc. 70 at 10].

At the outset, the Court notes that although the Defendant's Motion is styled as a Motion for Preliminary Injunction on the Defendant's Counterclaims, the Defendant dedicates almost the entirety of its argument in support of its Motion to raising the same arguments attacking the validity of the Purported Indemnity Agreement that it raised in opposition to the Plaintiff's Second Motion for Preliminary Injunction. [Id. at 10-18]. Likewise, because the Plaintiff's rights to demand collateral from the Defendant and to seize the Defendant's assets arise from the Purported Indemnity Agreement, the injunctive relief that the Defendant seeks is premised on the argument that the Purported Indemnity Agreement is invalid and unenforceable. Having determined that the Plaintiff is likely to succeed in showing that the

parties entered into and are bound by the Purported Indemnity Agreement for the reasons previously stated in this Order, the Court necessarily concludes that the Defendant is not likely to succeed in showing that the Purported Indemnity Agreement is invalid and unenforceable.

Notably, the Defendant's Counterclaims for breach of contract, breach of implied covenant of good faith and fair dealing, and unfair and deceptive trade practices relate only to the Plaintiff's alleged promise to advance $1.5 million to the Defendant. [Amended Countercl., Doc. 63 at ¶¶ 70-88]. As the Court previously noted, the issue of whether the Plaintiff was contractually obligated to advance the Defendant additional funding is entirely separate from the issue of whether the Purported Indemnity Agreement is valid and enforceable. Thus, the injunctive relief that the Defendant now seeks is unrelated to these three Counterclaims. Moreover, the Defendant makes no argument in its Memorandum in Support of Defendant's Motion for Preliminary Injunction as to why it is likely to be successful on the merits of these Counterclaims.[13] Accordingly, the Defendant has failed to show that it

---

[13] The Defendant alleges in its Amended Answer and Counterclaims that a representative of the Plaintiff agreed via text message to advance $1.5 million to the Defendant, [Amended Countercl., Doc. 63 at ¶¶ 17-19], the Defendant alleges that the Plaintiff's agents repeatedly stated the Plaintiff would make the second $750,000 advancement, [id. at ¶¶ 29, 37, 40], and the Defendant presented a January 3, 2022 email from the Defendant to the Plaintiff in which William H. West, IV asserts that the Plaintiff breached its agreement to advance $1.5 million and a January 7, 2022 letter from the Plaintiff to the

is likely to succeed on the merits of its Counterclaims for breach of contract, breach of implied covenant of good faith and fair dealing, and unfair and deceptive trade practices.

Further, to the extent that the Defendant's Counterclaims for fraud in the inducement, tortious interference with contract, and defamation might have any relation to the Purported Indemnity Agreement, the Defendant has also failed to show that it is likely to succeed on the merits of those Counterclaims. To recover for fraud in the inducement, a party must show "(1) false representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." Ward v. Fogel, 237 N.C. App. 570, 581, 768 S.E.2d 292, 301 (2014)). The Defendant argues that the Plaintiff "made representations and a promise to fund an initial $1,500,000.000" and "[p]rior to paying the second half of the minimum of promised amounts, [the Plaintiff] realized the invalidity of the Purported Indemnity Agreement and concealed such material fact while actively representing terms and conditions from the Purported Indemnity Agreement

_____

Defendant in which Kathleen Maloney asserts that the Plaintiff has no obligation to advance additional funds to the Defendant, [Doc. 70-4]. However, the Defendant fails to offer any argument as to why those facts support each of the elements of its Counterclaims for breach of contract, breach of implied covenant of good faith and fair dealing, and unfair and deceptive trade practices under North Carolina law.

47

to Project Participants [project owners, subcontractors, and suppliers]." [Doc. 70 at 20]. The Defendant also argues that the Plaintiff "knew there were issues with the signatures [on the Purported Indemnity Agreement] as it marked-out the signatures when forwarding copies of the Purported Indemnity Agreement to project participants," [id. at 4], and the Plaintiff "sent [the Defendant] paperwork that required William H. West, III and William H. West IV . . . to sign personal guarantees" during negotiations about the $1.5 million funding advancement because the Plaintiff had "realized it did not have a proper indemnification agreement in place," [id. at 5]. The Defendant further argues that the Plaintiff's "concealment of material fact was made with the intent to deceive and did, in fact deceive [the Defendant] and Project Participants" and "had [the Plaintiff] not made representations regarding project funding nor representations to Project Participants regarding the Purported Indemnity Agreement, [the Defendant] would not have been damaged by way of [the Plaintiff's] conduct." [Id.].

Here, the Defendant merely recites the elements of its Counterclaim and makes speculative assertions about the Plaintiff's actions and beliefs regarding the validity of the Purported Indemnity Agreement. The Defendant has offered no evidence showing that the Plaintiff believed that the Purported Indemnity Agreement was invalid or that the Plaintiff intended to deceive the

Defendant or project owners when representing the terms of the Agreement after it was executed. Moreover, the Defendant makes no cogent argument as to how the Plaintiff could tortiously conceal from the Defendant the Defendant's *own* actions. Because the Court has determined that the Plaintiff is likely to succeed in showing that the Purported Indemnity Agreement is valid, the Defendant is therefore unlikely to succeed in showing that the Plaintiff's statements regarding this enforcement of the terms of the Agreement were false.[14] Further, although there may be a question as to whether the Plaintiff was contractually obligated to advance $1.5 million to the Defendant, the Defendant has offered no evidence showing that the Plaintiff intended to deceive the Defendant when allegedly promising to make that advancement. Accordingly, based on the record currently before the Court, the Defendant has failed to show that it is likely to succeed on the merits of its Counterclaim for fraud in the inducement.

To recover for tortious interference with contract, a party must show the following:

> (1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract;

---

[14] The Defendant, in its arguments, appears to conflate promises and proposals with representations of any subsisting fact.

> (4) and in doing so acts without justification; (5) resulting in actual damage to the plaintiff.

United Labs, Inc. v. Kuykendall, 322 N.C. 643, 662, 370 S.E.2d 375, 387 (1988). The Defendant argues that "[b]ecause the Purported Indemnity Agreement is invalid and unenforceable, [the Plaintiff's] inducement of Project Owners to pay [the Plaintiff] amounts that were actually owed to [the Defendant] is nothing short of tortious interference with contract . . . ." [Doc. 70 at 18-19]. Here, because the Plaintiff is likely to succeed in showing that the Purported Indemnity Agreement is valid and that Agreement grants the Plaintiff the right to take possession of contract payments, the Defendant is unlikely to succeed in showing that the Plaintiff acted without justification in requesting that project owners submit contract payments to the Plaintiff. Accordingly, the Defendant has failed to show that it is likely to succeed on the merits of its Counterclaim for tortious interference with contract.

To recover for defamation, a party must show "that the defendant made false, defamatory statements of or concerning the plaintiff, which were published to a third person, causing injury to the plaintiff's reputation." Boyce & Isley, PLLC v. Cooper, 211 N.C. App. 469, 478, 710 S.E.2d 309, 317 (2011). As to this Counterclaim, Defendant argues only that:

> Based upon false representations made by [the Plaintiff] to [the Defendant's] sucontractors/suppliers (regarding funds misappropriation without having

50

investigated such claims) and Project Owners (regarding default/breach of the Purported Indemnity Agreement), not only has [the Plaintiff] interfered with contractual duties owed to [the Defendant], but the correspondence produced by [the Plaintiff] provides for a likelihood of success on the merits of [the Defendant's] defamation claim.

[Doc. 70 at 19]. Here, the Defendant has produced a letter from the Plaintiff to one company with a claim against a Bonded Contract stating that "Frankenmuth's position [is] that National Bridge, its representatives and related entities have misappropriated and misused contract funds . . . ," [Doc. 70-16], and the Defendant has presented Kathleen Maloney's testimony that she did not contact payees "to verify the checks and payments that National Bridge told us that they issued from the funds that they got from Frankenmuth." [Doc. 70-17]. However, the Defendant has not produced any evidence at this stage of litigation indicating that the statement that the Defendant misappropriated contract funds is false.

Regarding the Plaintiff's statements that the Defendant was in default of the Purported Indemnity Agreement, the Defendant again asserts that it "never defaulted on a single bridge project."[15] [Doc. 70 at 3]. The Defendant

_____

[15] The Court again notes that this statement from the Defendant is entirely inconsistent with the Defendant's prior statement that the Plaintiff's failure to advance $1.5 million to the Defendant "resulted in . . . [National Bridge] *defaulting, for the first time in its existence,* on various NC and SC DOT projects[.]" [Doc. 48 at 19] (emphasis added).

also presented one email from December 2021 in which one NCDOT employee stated to other NCDOT employees that "[Defendant National Bridge] has not defaulted," [Doc. 70-8 at 9], and one email from February 2022 in which a SCDOT employee implies that the Defendant is not in "material breach" of a particular project, [Doc. 70-5]. However, the Defendant has failed to present evidence showing that they have not defaulted from *any* Bonded Contract, and the Defendant fails to acknowledge that the Purported Indemnity Agreement provides numerous circumstances, in addition to being defaulted from a Bonded Contract, under which the Defendant is in default of the Purported Indemnity Agreement.[16] Thus, the Defendant has similarly failed to produce evidence showing that the statement that the Defendant was in default of the Purported Indemnity Agreement is false. Accordingly, based on the record currently before the Court, the Defendant has failed to show that it is likely to succeed on the merits of its Counterclaim for defamation.

---

[16] Such circumstances include "(b) the actual or alleged breach, abandonment, refusal, or inability or failure to perform any Contract; (c) breach of any provision of this Agreement; (d) failure to make payment of a properly due and owing bill in connection with any Contract; . . . [and] (j) any failure of any Indemnitor to perform its obligations under this Agreement in accordance with its terms . . . ." [Doc. 1-1 at 1-2].

For all these reasons, the Defendant has failed to show that it is likely to succeed on the merits of its Counterclaims.  The Defendant's Motion for Preliminary Injunction [Doc. 69] is, therefore, denied.

## ORDER

**IT IS, THEREFORE, ORDERED** that the Plaintiff's Motion to Withdraw Motion for Preliminary Injunction [Doc. 40] is **GRANTED,** and the Plaintiff's Motion for Preliminary Injunction Compelling Deposit of Collateral and Access to Books and Records [Doc. 13] is **WITHDRAWN.**

**IT IS FURTHER ORDERED** that the Plaintiff's Second Motion for Preliminary Injunction Compelling Deposit of Collateral and Access to Books and Records [Doc. 37] is **GRANTED,** and, within thirty (30) days of the entry of this Order, Defendant National Bridge is hereby **ORDERED** to (1) deposit collateral security with the Plaintiff in the amount of $15,910,811.76 and (2) furnish the Plaintiff free access to Defendant National Bridge's books, records, and accounts.

**IT IS FURTHER ORDERED** that the Defendant's Motion for Preliminary Injunction [Doc. 69] is **DENIED.**

**IT IS SO ORDERED.**

Signed: May 22, 2023

Martin Reidinger