**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**ASHEVILLE DIVISION**
**CIVIL CASE NO. 1:22-cv-00024-MR-WCM**

| | | |
|---|---|---|
| **FRANKENMUTH MUTUAL** | ) | |
| **INSURANCE CO.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **MEMORANDUM OF** |
| **vs.** | ) | **DECISION AND ORDER** |
| | ) | |
| **NATIONAL BRIDGE BUILDERS, LLC,** | ) | |
| **WILLIAM H. WEST, III, WILLIAM H.** | ) | |
| **WEST, IV, GEMINI III TRUST, and** | ) | |
| **GEMINI IV TRUST,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on the Plaintiff Frankenmuth Mutual

Insurance Company's Motion for Summary Judgment [Doc. 117] and the

Defendant National Bridge Builders, LLC's Motion for Partial Summary

Judgment [Doc. 119].

## I.    PROCEDURAL BACKGROUND

On February 10, 2022, the Plaintiff Frankenmuth Mutual Insurance

Company ("Frankenmuth") initiated this action against the Defendant

National Bridge Builders, LLC ("National Bridge") for claims arising from

National Bridge's alleged breach of the parties' purported General

Agreement of Indemnity (the "Indemnity Agreement").[1]  [Doc. 1].  In its Complaint, Frankenmuth asserts claims against National Bridge for specific performance of various provisions of the Indemnity Agreement (Counts I, II, and III); breach of contract (Count IV); conversion of trust funds (Count V); and breach of fiduciary duty (Count VI).  [Id.].  In its initial Answer, National Bridge asserted Counterclaims against Frankenmuth for fraud in the inducement (First Counterclaim) and unfair and deceptive trade practices under N.C. Gen. Stat. § 75-1.1 ("Chapter 75") (Second Counterclaim).  In an Amended Answer filed on January 11, 2023, National Bridge asserted additional counterclaims of breach of contract (Third Counterclaim), breach of implied covenant of good faith and fair dealing (Fourth Counterclaim), tortious interference with contract (Fifth Counterclaim), and defamation (Sixth Counterclaim).

On May 22, 2023, the Court entered a Preliminary Injunction directing National Bridge to (1) deposit collateral security with Frankenmuth in the

_____

[1] Frankenmuth also named William H. West, III, William H. West, IV, Gemini III Trust, and Gemini IV Trust as defendants in this action.  [Doc. 1].  Frankenmuth subsequently dismissed its claims against these defendants without prejudice [Doc. 34], leaving National Bridge as the sole remaining defendant in this action.

amount of $15,910,811.76 and (2) furnish Frankenmuth with free access to National Bridge's books, records, and accounts.[2]  [Doc. 123].

This matter is now before the Court on the parties' cross-motions for partial summary judgment.  [Docs. 117, 119].  Specifically, Frankenmuth moves for partial summary judgment in its favor relative to its claims for specific performance as stated in Counts I and II, its claim for breach of contract as stated in Count IV, and National Bridge's First, Second, Fifth, and Sixth Counterclaims for fraudulent inducement, violations of Chapter 75, tortious interference with contract, and defamation.[3]  [Doc. 117].  National Bridge moves for partial summary judgment in its favor as to each of Frankenmuth's causes of action as well as National Bridge's First, Fifth, and Sixth Counterclaims.[4]  [Doc. 119].

Having been fully briefed, these motions are now ripe for disposition.

---

[2] National Bridge has appealed the Court's May 22, 2023 Order [Doc. 133], and that appeal remains pending.

[3] Frankenmuth does not move for summary judgment with respect to its specific performance claim set forth in Count III, it claims for conversion of trust funds as stated in Count V, or its claims for breach of fiduciary duty as stated in Count VI.  Further, Frankenmuth does not move for summary judgment with respect to National Bridge's Third and Fourth Counterclaims for breach of contract and breach of implied covenant of good faith and fair dealing.

[4] National Bridge does not seek summary judgment with respect to its counterclaims for its Second Counterclaim for violations of Chapter 75, its Third Counterclaim for breach of contract or its Fourth Counterclaim for breach of implied covenant of good faith and fair dealing.

3

## II.  STANDARD OF REVIEW

Summary judgment is appropriate if the pleadings, depositions, answers, admissions, stipulations, affidavits, and other materials on the record show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a)&(c).  "As the Supreme Court has observed, 'this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.'"  Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 519 (4th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)).

"Facts are material when they might affect the outcome of the case, and a genuine issue exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party."  Ballengee v. CBS Broad., Inc., 968 F.3d 344, 349 (4th Cir. 2020) (quoting News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth., 597 F.3d 570, 576 (4th Cir. 2010)).  The Court does not make credibility determinations or weigh the evidence when ruling on a motion for summary judgment.  Guessous v. Fairview Prop. Invs., LLC, 828 F.3d 208, 216 (4th Cir. 2016).  "Regardless of whether he may ultimately be responsible for proof and persuasion, the party seeking summary

4

judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact." Bouchat, 346 F.3d at 522. If this showing is made, the burden then shifts to the nonmoving party who must convince the Court that a triable issue does exist. Id.

Where, as here, the parties each move for summary judgment on the same claim, the Court "must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks and citation omitted). In considering each of the motions for summary judgment, the Court must view the pleadings and materials presented in the light most favorable to the non-movant and must draw all reasonable inferences in the non-movant's favor as well. Adams v. UNC Wilmington, 640 F.3d 550, 556 (4th Cir. 2011).

## III.  FACTUAL BACKGROUND

The following is a recitation of the relevant facts, which are undisputed unless otherwise noted.

Frankenmuth is a corporation incorporated under the laws of Michigan, and it has its principal place of business in Michigan. [Doc. 1 at ¶ 1]. National Bridge is a limited liability company formed in 2017 under the laws of North Carolina. [Id. at ¶¶ 2, 12]. National Bridge is engaged in the construction

5

contracting business, including construction activities on public projects in North Carolina, South Carolina, and Virginia. [Id. at ¶ 12].

Gemini III Trust and Gemini IV Trust act as members of National Bridge, and both trusts hold a fifty percent ownership interest in National Bridge. [Doc. 121: West III Decl. at ¶¶ 7-8; Doc. 122: West IV Decl. at ¶¶ 7-8]. William H. West, III is the sole Trustee of Gemini III Trust, and William H. West, IV is the sole Trustee of Gemini IV Trust. [Doc. 121: West III Decl. at ¶ 9; Doc. 122: West IV Decl. at ¶ 9]. William H. West, III and William H. West, IV (collectively, "the Wests") are co-managers of National Bridge. [Doc. 121: West III Decl. at ¶ 10; Doc. 122: West IV Decl. at ¶ 10]. According to National Bridge's Operating Agreement, "all decisions, elections, determination, or other actions" (other than transactions involving less than $10,000) require "the approval, consent, agreement, or ratification of" both Managers. [Doc. 50-1: Operating Agreement at 8-9].

In 2018, National Bridge solicited surety bonds from Frankenmuth. [Doc. 113: Fifth Maloney Decl. at ¶ 2]. On August 22, 2018, Dena Brown, using the email address dena@nationalbridgebuilders.us, electronically executed an Indemnity Agreement on behalf of National Bridge in favor of Frankenmuth via DocuSign. [Id. at ¶ 6; Doc. 113-7 at 9]. Dena Brown signed the Indemnity Agreement as "William H. West." [Id.]. Dena Brown is the

6

sister of the Wests. [Doc. 53 at ¶ 2]. Neither of the Wests executed the Indemnity Agreement, reviewed the Indemnity Agreement, or received a DocuSign link to sign the Indemnity Agreement. [Doc. 121: West III Decl. at ¶¶ 1-3; Doc. 122: West IV Decl. at ¶¶ 1-3].

According to the Wests, prior to issuing the bonds, Frankenmuth "had undergone underwriting of [National Bridge], including but not limited to, upon information and belief, reviewing and/or receiving a copy of [National Bridge's] operating agreement and/or information concerning signing authority for [National Bridge]." [Doc. 121; West III Decl. at ¶ 13; Doc. 122; West, IV Decl. at ¶ 13]. Frankenmuth denies that it ever received and/or had notice of the terms of National Bridge's Operating Agreement. Further, Frankenmuth asserts that National Bridge "never communicated any limitations whatsoever on the authority of Dena Brown or any other representative/agent to act on National Bridge's behalf" until National Bridge filed its response to Frankenmuth's Second Motion for Preliminary Injunction on November 28, 2022. [Doc. 53: Third Maloney Decl. at ¶ 3].

In the National Bridge's 2018 Limited Liability Company Annual Report, Dena Brown is listed as National Bridge's Secretary, and she is the only company official listed. [Doc. 53-1: 2018 Annual Report]. In August of 2018, five days before executing the Indemnity Agreement, Dena Brown signed a

7

Letter of Intent to Perform as a Subcontractor to NCDOT on behalf of National Bridge with a total commitment amount of $24,355.00, and she indicated that she was a manager of National Bridge. [Doc. 53-2: Letter of Intent].

Following the execution of the Indemnity Agreement, Frankenmuth began issuing final bonds on behalf of National Bridge.[5] [Doc. 132: Sixth Maloney Decl. at ¶ 4]. On August 27, 2018, Frankenmuth issued Contract Performance Bond SUR2001132 and Contract Payment Bond SUR2001132, both in the amount of $889,301.50, on behalf of National Bridge. [Doc. 132-2]. Dena Brown was National Bridge's sole signatory on Contract Performance Bond SUR2001132 and Contract Payment Bond SUR2001132 in her capacity as "Authorized Agent" for National Bridge. [Id.].

On August 28, 2018, Frankenmuth issued Contract Performance Bond SUR2001134 and Contract Payment Bond SUR2001134, both in the amount

---

[5] Prior to the execution of the Indemnity Agreement, Frankenmuth had issued a bid bond on behalf of National Bridge relative to the latter's bid for NCDOT Contract DE00251. A "bid bond" is a type of bond issued before a bonded contract is awarded/executed. The penal sum of a bid bond is generally only a small percentage of the bid to which it relates; thus, in the case of the bid bond for NCDOT Contract DE00251, the penal sum equaled 5% of National Bridge's bid for the contract. By contrast, a "final bond" consists of a performance bond or payment bond that is typically issued after a bonded contract is awarded/executed. The penal sum of a performance bond or a payment bond generally equals 100% of the initial price of the awarded/executed contract to which such final bonds relate. [Doc. 132: Sixth Maloney Decl. at ¶ 2].

of $2,256,939.77, on behalf of National Bridge. [Doc. 132-1]. Dena Brown was again the sole signatory on behalf of National Bridge, and she indicated below her signature that she was a "manager." [Id.].

On October 15, 2019, Frankenmuth's Director of Surety Claims, Kathleen Maloney ("Maloney"), sent written correspondence to William H. West, IV and to National Bridge's bonding agent, Clay Tresher, emphasizing Frankenmuth's rights under the Indemnity Agreement. [Doc. 132: Sixth Maloney Decl. at ¶ 5]. Neither West nor Tresher challenged or objected to the enforceability of the Indemnity Agreement, and they instead participated in National Bridge's subsequent solicitation of additional bonds from Frankenmuth with penal sums totaling $44,350,240.00. [Id.].

In January of 2020, the Wests witnessed Dena Brown sign a Performance and Indemnity Bond and a Payment Bond, both in the amount of $2,797,679.47, with the South Carolina Department of Transportation ("SCDOT") as a manager of National Bridge. [Doc. 53-6: SCDOT Bond].

On April 2, 2020, a representative of Frankenmuth emailed a copy of the DocuSigned Indemnity Agreement to Robert Coon, one of National Bridge's bonding agents. [Doc. 132: Sixth Maloney Decl. at ¶ 6]. Coon never took any issue with the DocuSigned Indemnity Agreement and instead participated in National Bridge's solicitation and acceptance of eleven more

9

performance bonds, eleven more payment bonds, and one license bond with aggregate penal sums totaling $31,654,273.66.  [Id.].

In written correspondence dated May 5, 2020, Maloney emphasized Frankenmuth's rights as surety under the Indemnity Agreement to Coon and William H. West, IV.  [Doc. 132: Sixth Maloney Decl. at ¶ 7].  Neither Coon nor West challenged or objected to the enforceability of the Indemnity Agreement, and they instead participated in National Bridge's subsequent solicitation of additional bonds from Frankenmuth.  [Id.].

In total, from April 27, 2018 through March 23, 2021, National Bridge's Bonding Agents executed 35 performance bonds, 35 payment bonds, and one license bond with combined penal sums exceeding $108,000,000 at National Bridge's request.  [Doc. 132: Sixth Maloney Decl. at ¶ 10].  These bonds enabled National Bridge to, among other things, perform public construction contracts (hereinafter "the Bonded Contracts") with the North Carolina Department of Transportation ("NCDOT"), the South Carolina Department of Transportation ("SCDOT"), and the Virginia Department of Transportation ("VDOT").  [Id.].  Without Frankenmuth's surety bonding program, National Bridge could not have bid on or even been considered for any of those public construction contracts.  [Id.].  National Bridge never once questioned or objected to the enforceability of the Indemnity Agreement

against National Bridge until long after Frankenmuth initiated this action to enforce the Indemnity Agreement. [Id. at ¶ 11].

The Indemnity Agreement requires National Bridge to indemnify Frankenmuth from all "Loss"[6] and grants Frankenmuth the right, in its sole discretion, to settle any claim against any bond. [Doc. 1-1 at 3]. Paragraph 5 of the Indemnity Agreement further requires National Bridge to deposit collateral with Frankenmuth. [Doc. 1-1 at 3]. On this point, the Indemnity Agreement states as follows:

> Indemnitors[7] agree to deposit with [Frankenmuth], upon demand, funds, other collateral security acceptable to [Frankenmuth], in an amount as determined by [Frankenmuth] sufficient to discharge any Loss or anticipated Loss. Indemnitors further agree to deposit with [Frankenmuth], upon demand, an amount equal to the value of any assets or Contract funds improperly diverted by any Indemnitor. Sums deposited with [Frankenmuth] pursuant to this paragraph may be used by [Frankenmuth] to pay such claim or be held by [the Plaintiff] as collateral security against any Loss or

---

[6] Regarding "Loss," the Indemnity Agreement provides, in part, that the "[i]ndemnitors' liability to [Frankenmuth] includes all Loss, all payments made, and all actions taken by [Frankenmuth] under the Good Faith belief that [Frankenmuth] is, would be or was liable for the Loss, the amounts paid or the actions taken or that it was necessary or expedient to incur such Loss, make such payments or take such actions, whether or not such liability, necessity or expediency existed." [Doc. 1-1 at 2].

[7] The "Indemnitors" under the Indemnity Agreement included National Bridge, William H. West, III, William H. West, IV, Gemini III Trust, and Gemini IV Trust. As noted *supra*, Frankenmuth has dismissed its claims against William H. West, III, William H. West, IV, Gemini III Trust, and Gemini IV Trust without prejudice.

11

unpaid premium on any Bond. [Frankenmuth] shall have no duty to invest, or provide interest on the collateral. Indemnitors agree that [Frankenmuth] would suffer irreparable damage and would not have an adequate remedy at law if Indemnitors fail to comply with the provisions of this paragraph. Any remaining funds held by [Frankenmuth] after payment of all sums due to [Frankenmuth] under this Agreement shall be returned upon the complete release and/or discharge of [Frankenmuth's] liability under all Bonds. In addition to the foregoing, Indemnitors shall promptly, on [Frankenmuth's] written demand, procure the full and complete discharge of [Frankenmuth] from all Bonds demanded by [Frankenmuth] and all liability in connection with such Bonds. If indemnitors are unable to obtain such discharge within the time demanded, Indemnitors shall promptly deposit with [Frankenmuth] an amount of money that [Frankenmuth] determines is sufficient to collateralize or pay any outstanding bonded obligations, or otherwise make provisions acceptable to [Frankenmuth] for the funding of the bonded obligations.

[Id.].

Paragraph 12 of the Indemnity Agreement further requires National Bridge to provide Frankenmuth access to National Bridge's books and records. [Id. at 4]. This provision states, in pertinent part, as follows:

Indemnitors shall furnish upon demand, and [Frankenmuth] shall have the right of free access to, at reasonable times, the records of Indemnitors including, but not limited to, books, papers, records, documents, contracts, reports, financial information,

12

accounts and electronically stored information, for the purpose of examining and copying them.

[Id.].  Paragraph 25 of the Indemnity Agreement also provides that:

> Indemnitor shall permit any of [Frankenmuth's] officers, employees, agents or other representatives to visit and inspect upon reasonable notice during business hours any of the locations of Indemnitor (provided that, while a Default exists, [Frankenmuth] may make such visits and inspections at any time without prior notice), to examine and audit all of Indemnitor's Property, books of account, records, reports and other papers, to make copies and extracts therefrom and to discuss its affairs, finances and accounts with its officers, employees and independent certified public accountants. Indemnitors shall incur expenses at the standard rates charged by [Frankenmuth] for such activities when an open claim or default exists.  Should [Frankenmuth] deem it necessary to visit and inspect when no claim or default exists, it shall do so at its own expense.

[Id. at 7].

"[A]s additional security to secure the obligations of [National Bridge]," Paragraph 6 of the Indemnity Agreement also assigns Frankenmuth an interest in various property, including, in part, "all monies due or to become due to [National Bridge] as result of the [Bonded] Contract(s)" and "all supplies, materials, tools, machinery, plant and equipment . . . that may . . . be related to, or in, on or around the work or the work site covered by the

13

Bonds." [Id. at 3].  In the event of a default[8] under the Indemnity Agreement,

Paragraph 7 provides that:

> [Frankenmuth] shall have the right, in its sole discretion, and without limitation, to . . . (ii) take immediate possession of Contract funds whether earned or unearned, (iii) collect such sums as may be due [National Bridge] and to endorse in the name of [National Bridge], and (iv) collect any negotiable instruments; (e) require any Obligee to withhold payment of Contract funds unless and until [Frankenmuth] consents to its release and/or to direct the payment of said Contract funds to [Frankenmuth] or to its designee . . . ."

[Id. at 3-4].

---

[8] The Indemnity Agreement provides numerous circumstances under which National Bridge can default of the Agreement, including, but not limited to, the following: "(a) a declaration of Contract default by any Obligee; (b) the actual or alleged breach, abandonment, refusal, or inability or failure to perform any Contract; (c) a breach of any provision of this Agreement; (d) failure to make payment of a properly due and owing bill in connection with any Contract; (e) if in the sole opinion of the [Plaintiff], the contract funds to be paid are insufficient to pay the costs of completing any Contract or Contracts; (f) diversion of Contract funds for any Indemnitor's assets to the detriment of Contract obligations or any of [the Plaintiff's] right[s] under this Agreement or at law; (g) any Indemnitor's becoming the subject of any proceeding or agreement of bankruptcy, receivership, insolvency, or creditor assignment, or actually becoming insolvent; . . . (j) any failure of any Indemnitor to perform its obligations under this Agreement in accordance with its terms; (k) if there is any change in any Indemnitor's financial condition which, in [Frankenmuth's] opinion, has or would be reasonably likely to have a material adverse effect with respect to the business, assets, properties, financial condition, stockholders['] equity, contingent liabilities, prospects, material agreements or results of operations of any Indemnitor, Indemnitor's ability to perform its obligations under any Contracts and pay the obligations in accordance with the terms thereof, or the validity or enforceability of this Agreement . . . ."  [Doc. 1-1 at 1-2].

14

The Indemnity Agreement also requires National Bridge to "exonerate, indemnify and save [Frankenmuth] harmless from and against all Loss." [Doc. 1-1 at ¶ 3]. The Agreement defines "Loss" as follows:

> All loss, costs and expense of any kind or nature, including attorneys' and other fees or costs, which [Frankenmuth] incurs in connection with any Bond, Contract or this Agreement, including but not limited to all loss, cost and expense incurred by reason of: (a) the underwriting or issuance of any Bond, (b) making any investigation in connection with any Bond; (c) any claim, which means any notice, claim, demand, defense, counterclaim, setoff, lawsuit or proceeding or circumstance which may constitute, lead to or result in Loss, liability, or asserted liability in connection with any Bond or this Agreement, (d) any Indemnitor failing to timely and completely perform under or comply with this Agreement, (e) [Frankenmuth] enforcing this Agreement (f) [Frankenmuth] prosecuting or defending any action in connection with any Bond; (g) obtaining the release of any Bond; (h) [Frankenmuth] recovering or attempting to recover Property in connection with any Bond or this Agreement (i) [Frankenmuth] enforcing by litigation or otherwise any of the provisions of this Agreement, (j) any act of [Frankenmuth] to protect or procure any of [Frankenmuth's] rights, protect or preserve any of [Frankenmuth's] interests, or to avoid or lessen [Frankenmuth's] liability or alleged liability, and (k) all interest accruing on any such amounts at the maximum legal rate. Indemnitors' liability to [Frankenmuth] includes all Loss, all payments made, and all actions taken by [Frankenmuth] under the Good Faith belief that [Frankenmuth] is, would be or was liable for the Loss, the amounts paid or the actions taken or that it was necessary or expedient to incur such Loss, make such payments or take

15

such actions, whether or not such liability, necessity or expediency existed. Good Faith means, with respect to any act, exercise of discretion or omission by [Frankenmuth], an absence of dishonesty, evil intent and actual malice toward Indemnitors. An itemized statement of Loss, sworn to by any officer of [Frankenmuth], or vouchers, affidavits, or other evidence of payment by [Frankenmuth], shall be prima facie evidence of Indemnitors' liability for such Loss.

[Id. at 2]. Moreover, "[a]ll rights and remedies of the [Frankenmuth] under [the Indemnity Agreement] shall be cumulative, and the exercise of or failure to exercise any right or remedy shall not be an election of or waiver of any right or remedy." [Id. at 6].

In 2019, Frankenmuth began receiving claims against the bonds and notices of National Bridge's alleged breaches under the Bonded Contracts. [Doc. 39: Second Maloney Decl. at ¶ 3]. On April 12, 2019, the NCDOT notified Frankenmuth that National Bridge had made "unsatisfactory" progress under a Bonded Contract covered by Bond No. SUR 2001132. [Id.; see also Doc. 113: Fifth Maloney Decl. at ¶ 12]. By January of 2020, National Bridge's subcontractors and suppliers had "asserted claims against [Frankenmuth] under nine of the Bonds in an amount that exceeded $1,000,000." [Doc. 113: Fifth Maloney Decl. at ¶ 12]. On July 2, 2020, the NCDOT again notified Frankenmuth that National Bridge had made

16

"unsatisfactory" progress under a Bonded Contract covered by Bond No. SUR 0002256. [Id.; see also Doc. 39-3: Letter of Concern]. On November 23, 2020, the NCDOT declared National Bridge to be in "material breach" under a Bonded Contract covered by Bond No. SUR 2001135, and National Bridge was subsequently removed from the NCDOT's prequalified bidder's list in August of 2021 for withholding payment from a subcontractor/supplier related to a Bonded Contract covered by Bond No. SUR 2001150. [Doc. 39: Second Maloney Decl. at ¶ 3; see also Doc. 39-4: NCDOT Notice; Doc. 39-5: NCDOT Letter].

During an in-person meeting on September 1, 2021, the Wests and Dena Brown confirmed the existence of various other instances of "Default" within the meaning of the Indemnity Agreement. [Doc. 113: Fifth Maloney Decl. at ¶ 13]. Specifically, Frankenmuth's representatives learned that: (1) National Bridge had failed to make payment of properly due and owing bills in connection with Frankenmuth's Bonded Contracts; (2) National Bridge lacked the financial ability to pay amounts owed to its subcontractors/suppliers for labor, material, equipment, etc. they had furnished in relation to Frankenmuth's Bonded Contracts; (3) National Bridge lacked the financial ability to purchase materials needed to complete Frankenmuth's Bonded Contracts; and (4) National Bridge had utilized

17

Bonded Contract Proceeds for purposes other than paying obligations for which Frankenmuth may be liable under the Bonds including, but not limited to, National Bridge's idle equipment and labor costs. [Id.]. National Bridge's admitted financial inability to complete Frankenmuth's Bonded Contracts and/or to resolve its subcontractors/suppliers' claims against Frankenmuth's Bonds subjected Frankenmuth to significant "Loss" as defined by the Indemnity Agreement. [Id. at ¶ 14].

Even though it had the contractual right, in its sole discretion, to take over and cause the completion of the Bonded Contracts as of September 1, 2021 at the very latest, Frankenmuth loaned/advanced $750,000.00 to National Bridge on September 15, 2021 and permitted it to continue performing. [Id.]. Even after Frankenmuth loaned/advanced $750,000 to National Bridge on September 15, 2021 in an effort to mitigate Frankenmuth's damages, Frankenmuth continued receiving notices from NCDOT and SCDOT regarding National Bridge's unsatisfactory performance and failure to pay subcontractors/suppliers. [Id.]. In an email dated November 2, 2021, William H. West, III claimed that National Bridge had debts totaling $1,132,247.55 that "must be paid immediately to keep the projects progressing"—which National Bridge could not pay. [Id.]. During a November 22, 2021 meeting, National Bridge's agents represented in writing

18

that National Bridge needed $2,366,722.25 just to order necessary materials for some of the Bonded Contracts. [Id.]. The Wests also threatened to proverbially "give Frankenmuth the keys to National Bridge" in terms of completing the Bonded Contracts unless Frankenmuth loaned/advanced an additional $1,500,000.00. [Id.]. That same day, NCDOT confirmed its willingness to release Bonded Contract Proceeds directly to Frankenmuth, but the Wests objected. [Id.].

On December 9, 2021, Maloney advised National Bridge in a letter that Frankenmuth would consider advancing it an additional $750,000 (for a total loan/advance of $1,500,000) if National Bridge, Gemini III Trust, and Gemini IV Trust agreed to certain conditions. [Doc. 113: Fifth Maloney Decl. at ¶ 23; Doc. 113-15: 12/09/21 Letter]. Specifically, Frankenmuth set the following conditions:

> Frankenmuth is immediately provided with the outstanding financial information and is given full and complete access to the Books and Records of National Bridge, Gemini III Trust and Gemini IV Trust.
>
> Frankenmuth is immediately provided with the outstanding project information, is given full and complete access to the records of the projects for which it issued Bonds and will be given unfettered access to the project sites and National Bridge's project management.

> National Bridge will notify the Obligees on the
> Frankenmuth-bonded projects that all contract
> balances are to be deposited into a designated
> account (the account information to be provided by
> Frankenmuth).

[Doc. 113-15: 12/09/21 Letter at 2]. Frankenmuth further addressed National

Bridge's obligation to provide Frankenmuth access to books and records,

stating that:

> While Frankenmuth has made repeated requests to
> National Bridge for its financial and project
> information, only limited information has been
> provided by National Bridge. During a recently
> scheduled meeting at National Bridge's office,
> Frankenmuth was advised that the requested
> information, which is an obligation of National Bridge
> to provide, would not be produced until additional
> funding was received from Frankenmuth.

[Id.]. As explained in further detail below, National Bridge did not satisfy the

conditions set forth by Frankenmuth. [Doc. 39: Second Maloney Decl. at ¶

6].

In a letter dated December 20, 2021, Frankenmuth informed National

Bridge that Frankenmuth had received claims from National Bridge's

subcontractors and suppliers in excess of $1,137,528.91. [Id. at ¶ 7; Doc.

39-10: 12/20/21 Letter at 2]. Frankenmuth further reminded National Bridge

of its obligations under the Indemnity Agreement to deposit collateral and

provide access to books and records. [Doc. 39-10: 12/20/21 Letter at 2].

Frankenmuth demanded that National Bridge deposit collateral with Frankenmuth and that National Bridge provide "full and complete access to all of the financial information and records and the records of all of the projects on which Frankenmuth issued Bonds." [Id. at 2-3].

Frankenmuth further took steps to protect its own legal and equitable interest in the Bonded Contract Proceeds by requesting that NCDOT, SCDOT, and other obligees remit all unpaid Bonded Contract Proceeds to Frankenmuth so it could insure they were used for their intended purpose of satisfying obligations for which Frankenmuth may be liable under the Bonds. [Doc. 113: Fifth Maloney Decl. at ¶ 15]. In that regard, Frankenmuth stated the following to NCDOT and SCDOT regarding the payment of unpaid Bonded Contract Proceeds to Frankenmuth in several letters dated December 20, 2021:

> As you know, Frankenmuth Mutual Insurance Company is the surety for National Bridge Builders, LLC in connection with the captioned project. As surety, Frankenmuth is aware of incomplete work on National Bridge's contract, outstanding amounts owed by National Bridge to its subcontractors and suppliers, or both. As such, Frankenmuth is being exposed to potential losses on its Performance and Payment Bonds.
>
> Frankenmuth will establish an account into which all contract balances on this project are to be deposited and will shortly provide to you the information on this

> account. In the interim, Frankenmuth demands that the [NCDOT/SCDOT] obtain Frankenmuth's written consent before it issues any further payments to, or on behalf of, National Bridge.

[Id.]. NCDOT and SCDOT subsequently agreed to remit all unpaid Bonded Contract Proceeds to Frankenmuth. [Doc. 113: Fifth Maloney Decl. at ¶ 16].

On December 23, 2021, while Frankenmuth was considering advancing an additional $750,000 to National Bridge, Frankenmuth also sent William H. West, IV a proposed Addendum to the Indemnity Agreement,[9] a copy of the Indemnity Agreement, and a DocuSign Certificate of Completion for the Indemnity Agreement. [Doc. 53: Third Maloney Decl. at ¶ 7; see also Doc. 53-10: 12/23/21 Email re: Copy of Indemnity Agreement; Doc. 53-11: 12/23/21 Email re: Proposed Addendum]. While West did not execute the Addendum, he also did not question or challenge the fact that National Bridge was bound by the initial Indemnity Agreement. [Doc. 53: Third Maloney Decl. at ¶ 7]. Frankenmuth ultimately did not advance an additional $750,000 to National Bridge. [Doc. 39: Second Maloney Decl. at ¶ 6].

On January 3, 2022, William H. West, IV emailed a representative of Frankenmuth and asserted that Frankenmuth breached its agreement to

---

[9] The Proposed Addendum would have added William H. West, IV as a personal indemnitor on construction projects in Virginia. [Doc. 53-10].

22

advance $1.5 million to National Bridge. [Doc. 70-4: 01/07/22 Emails]. In a letter dated January 7, 2022, Maloney asserted that Frankenmuth had no obligation to advance additional funds to National Bridge. [Doc. 39-11: 01/07/22 Letter at 1].

Even though Frankenmuth loaned/advanced $750,000.00 to National Bridge to use toward the completion of Frankenmuth's Bonded Contracts and the payment of National Bridge's subcontractors/suppliers, National Bridge's unpaid debts to its subcontractors/suppliers substantially exceeded the Bonded Contract Proceeds that National Bridge earned under the Bonded Contracts. [Doc. 113: Fifth Maloney Decl. at ¶ 16]. For example, on January 25, 2022, NCDOT remitted Bonded Contract Proceeds totaling $632,063.26 to Frankenmuth for work National Bridge or its subcontractors/suppliers had performed. [Id.]. By that point, Frankenmuth had already paid nearly $425,000 to National Bridge's subcontractors/suppliers under Frankenmuth's Bonded Contracts involving NCDOT. [Id.]. By the time Frankenmuth received another penny from NCDOT, Frankenmuth's payments to National Bridge's subcontractors/suppliers exceeded those Bonded Contract Proceeds by nearly $875,000.00. [Id.].

Despite Frankenmuth's $750,000.00 loan/advancement to National Bridge and Frankenmuth's payments in excess of the Bonded Contract Proceeds it had received, NCDOT defaulted National Bridge under several of the NCDOT Bonded Contracts. [Id. at ¶ 17]. As memorialized through various Takeover Agreements between Frankenmuth and NCDOT, Frankenmuth has retained other contractors and is actively completing a number of NCDOT Bonded Contracts under its corresponding Bonds. [Id.].

As reflected by a separate Takeover Agreement, NCDOT also defaulted National Bridge under several other Bonded Contracts for failing to furnish affidavits that either (1) confirmed "that all obligations and debts arising from construction have been satisfied" or (2) listed "obligations not satisfied." [Id.]. Frankenmuth's completion costs and payments to subcontractors/suppliers on the Bonded Contracts involving NCDOT have and will substantially exceed any Bonded Contract Proceeds that Frankenmuth has or will receive from NCDOT. [Id.].

The same is true for the Bonded Contract Proceeds that Frankenmuth has or may receive from SCDOT. For example, Frankenmuth's payments to subcontractors/suppliers under Payment Bond SUR0002257 exceed the Bonded Contract Proceeds that Frankenmuth has received relative to SCDOT Contract 17981 by more than $110,000.00. [Id. at ¶18]. Likewise,

24

Frankenmuth's payments to and/or pending claims from subcontractors/suppliers against Payment Bond SUR2001165 currently exceed the Bonded Contract Proceeds that Frankenmuth has received relative to SCDOT Contract 17843 by more than $160,000.00. [Id.]. In other words, even though Frankenmuth permitted National Bridge to complete SCDOT Contract 17843, National Bridge's debts to Bond Claimants significantly exceed the Bonded Contract Proceeds that National Bridge earned under SCDOT Contract 17843, which exposes Frankenmuth to additional loss under Payment Bond SUR2001165. [Id.].

In March of 2022, one of National Bridge's subcontractors/suppliers, Trinity Products, Inc. ("Trinity"), asserted a claim against one of Frankenmuth's Bonds. [Doc. 113: Fifth Maloney Decl. at ¶ 19]. After Trinity produced unsigned quotes from National Bridge in support of its claim, Maloney expressed Frankenmuth's concerns about National Bridge's records in a letter dated March 23, 2022, which read, in pertinent part as follows:

> In your email, you attached two executed but unsigned quotes from National Bridge.
>
> Given National Bridge's prior communications to its subcontractors and suppliers, and *given Frankenmuth's position that National Bridge, its representatives and related entities have*

*misappropriated and misused contract funds*, the timing of National Bridge's execution and submission of signed quotes is suspect and concerning. Until recently, neither National Bridge nor Trinity Products were able to produce a signed contract or agreement, despite your company indicating that it supplied materials to the project over four months ago. Frankenmuth will not accept a signed quote from National Bridge at this juncture; rather Frankenmuth is continuing with its independent investigation of your company's claim.

Once our investigation is complete, we will provide to you our response.

[Doc. 68-7: 03/22/22 Letter] (emphasis added). Frankenmuth ultimately paid $59,489.00 to settle Trinity's bond claim and is seeking to recover that settlement payment from National Bridge through its breach of contract claim. [Doc. 113: Fifth Maloney Decl. at ¶ 19].

After accounting for proceeds under the Bonded Contracts, Frankenmuth estimates that it will incur an anticipated "Loss" of more than $15,910,811.76. [Doc. 39: Second Maloney Decl. at ¶ 8]. Frankenmuth has already paid net "Loss" totaling $2,226,339.05 relative to the Bonded Contracts, and Frankenmuth estimates that it will incur additional "Loss" of $13,684,472.71.[10] [Id.]. Despite multiple requests, National Bridge has not

---

[10] Frankenmuth has also submitted a list of the Bonded Contracts under which Frankenmuth has already paid net "Loss" totaling $2,226,339.05. [Doc. 39: Second

deposited any collateral with Frankenmuth, and it has continued to deny Frankenmuth free access to its books and records. [Id. at ¶ 7; Doc. 53: Third Maloney Decl. at ¶¶ 9, 10].

## IV. DISCUSSION

### A. Validity/Enforceability of Indemnity Agreement

The primary argument underpinning National Bridge's Motion for Partial Summary Judgment (as well as its opposition to Frankenmuth's Motion for Summary Judgment), is National Bridge's contention that the Indemnity Agreement is invalid and unenforceable. Specifically, National Bridge asserts that the Indemnity Agreement is invalid because it was not signed by both of National Bridge's Managers, William H. West, III and William H. West, IV—as is required by National Bridge's Operating Agreement—and therefore lacks mutual assent. [Docs. 120, 127].

Under North Carolina law, "a valid contract exists only where there has been a meeting of the minds as to all essential terms of the agreement." Northington v. Michelotti, 121 N.C. App. 180, 184, 464 S.E.2d 711, 714 (1995). Moreover, a principal is bound to contracts made by its agents in

---

Maloney Decl. at ¶ 8]. Further, to estimate an additional, anticipated "Loss" of $13,684,472.71, Frankenmuth has submitted a table itemizing the estimated costs of completion, the remaining contract balances, and the resulting anticipated loss under some of National Bridge's Bonded Contracts with the NCDOT. [Id.].

three situations: "when the agent acts within the scope of his or her actual authority; when the agent acts within the scope of his or her apparent authority, and the third person is without notice that the agent is exceeding actual authority; and when a contract, although unauthorized, has been ratified." Wachovia Bank of North Carolina, N.A. v. Bob Dunn Jaguar, Inc., 117 N.C. App. 165, 170, 450 S.E.2d 527, 531 (1994).

Apparent authority exists where "the principal has held the agent out as possessing" authority or the principal has "permitted the agent to represent that he possesses" authority. Id. at 171, 450 S.E.2d at 531. "Whether the agent acts within the apparent scope of his authority is determined by what the principal does, not by the unauthorized acts and contentions of the agent." Id. at 172, 450 S.E.2d at 531-32.

Further, a principal ratifies the unauthorized acts of its agent where:

> [T]he party claiming ratification [proves] (1) that at the time of the act relied upon, the principal had full knowledge of all material facts relative to the unauthorized transaction . . . and (2) that the principal had signified his assent or his intent to ratify by word or by conduct which was inconsistent with an intent not to ratify.

Id. at 173, 450 S.E.2d at 532. A principal "must ratify the whole of his agent's unauthorized act or not at all. He cannot accept its benefits and repudiate its burdens." Snyder v. Freeman, 300 N.C. 204, 213-14, 266 S.E.2d 593,

28

600 (1980) (holding that "[t]he corporation, by accepting the benefits of the transaction intended to and did, in fact, ratify the agreement. It thereby became bound by the agreement").

Here, the undisputed forecast of evidence presented to the Court establishes that the Indemnity Agreement was executed by Dena Brown, who electronically signed the Indemnity Agreement as "William H. West." National Bridge's Operating Agreement states that William H. West, III and William H. West, IV shall serve as managers and that the consent of both managers is needed to bind National Bridge to contracts involving amounts over $10,000. Neither William H. West, III nor William H. West, IV executed, reviewed, or received the Indemnity Agreement prior its execution by Dena Brown. Accordingly, it appears that the Indemnity Agreement was not executed on behalf of National Bridge by someone with *actual* authority.

The parties have presented conflicting forecasts of evidence as to whether Frankenmuth received or had notice of the terms of National Bridge's Operating Agreement before November 28, 2022. However, it is uncontroverted that the Indemnity Agreement was executed by Dena Brown, and National Bridge has, until this litigation, regularly held her out as a manager and as having the authority to bind National Bridge to contracts involving amounts over $10,000. For example, in 2018, Defendant National

Bridge named Dena Brown as the corporate secretary and the *only* company official in National Bridge's Limited Liability Company Annual Report. Just days before executing the Indemnity Agreement, Dena Brown, acting on behalf of National Bridge, also executed a Letter of Intent to Perform as a Subcontractor with a total commitment amount of $24,355.00. Six days after executing the Indemnity Agreement, Dena Brown, again acting on behalf of National Bridge, executed a Contract Performance Bond and a Contract Payment Bond, both in the amount of $2,256,939.77, with the NCDOT. When executing these documents, Dena Brown listed her title as "manager" of National Bridge. [Docs. 53-2, 53-3]. Moreover, both William H. West, III and William H. West, IV witnessed Dena Brown execute, as a manager, a Performance and Indemnity Bond and a Payment Bond, both in the amount of $2,797,679.47, with the SCDOT. As such, the undisputed forecast of evidence shows that Dena Brown had at least apparent authority to execute the Indemnity Agreement on behalf of National Bridge.

Further, even if Dena Brown lacked apparent authority to bind National Bridge to the Indemnity Agreement, the undisputed forecast of evidence demonstrates that National Bridge ratified the Indemnity Agreement. After Dena Brown executed the Indemnity Agreement, Frankenmuth issued surety bonds totaling $54,401,405.02 for Defendant National Bridge. On December

20, 2021, Frankenmuth set a letter to National Bridge stating that the parties executed the Indemnity Agreement on August 22, 2018 and, under that agreement, National Bridge was obligated to, upon demand, deposit collateral and provide free access to books and records. Three days later, while the parties were negotiating an advancement of additional funds to National Bridge, Frankenmuth sent William H. West, IV a copy of the Indemnity Agreement along with the certification showing its execution via DocuSign. Having such full knowledge, no representative of National Bridge disaffirmed the contract, or questioned its execution, until National Bridge filed its Response in Opposition to Frankenmuth's Second Motion for Preliminary Injunction. Lastly, without the Indemnity Agreement, National Bridge would not have been able to secure the bonds, and without the bonds, National Bridge would not have been able to secure the construction contracts.[11] See N.C. Gen. Stat. § 44A-26 (requiring construction contracts for any one project exceeding $300,000 to be bonded). Therefore, the undisputed forecast of evidence demonstrates that National Bridge received

---

[11] National Bridge contends that execution of the Indemnity Agreement was not essential to the issuance of the surety bonds, noting that Frankenmuth had issued a number of bonds prior to the Indemnity Agreement being executed. The bonds cited by National Bridge, however, were all *bid* bonds [see Doc. 127-1 and footnote 5 supra], and it is undisputed that Frankenmuth did not issue any *final* bonds until after the Indemnity Agreement was signed on August 22, 2018.

the benefit of the Indemnity Agreement and thus ratified its execution, even if such may have been technically defective.

Therefore, based on the undisputed forecast of evidence presented by the parties the Court concludes that the parties entered into and are bound by the Indemnity Agreement. To the extent that National Bridge seeks summary judgment in its favor on the theory that the Indemnity Agreement is invalid and unenforceable, such motion is denied.

### B. Specific Performance/Breach of the Indemnity Agreement

Having determined that the undisputed forecast of evidence demonstrates the existence of a valid contract, the Court now turns to the question of whether Frankenmuth is entitled to summary judgment on its claims for specific performance and for the breach of various provisions of the Indemnity Agreement.

"An indemnity contract obligates the indemnitor to reimburse his indemnitee for loss suffered or to save him harmless from liability." Schenkel & Shultz, Inc. v. Hermon F. Fox & Assocs., P.C., 362 N.C. 269, 273, 658 S.E.2d 918, 921 (2008) (citation and internal quotation marks omitted). "In an indemnity contract, the agreement will be construed to cover all losses, damages, and liabilities which reasonably appear to have been within the contemplation of the parties[.]" New York Marine and Gen. Ins. Co. v. Beck

Elec. Co., No. 3:05CV 373-H, 2007 WL 160689, at *6 (W.D.N.C. Jan. 16, 2007), aff'd sub nom. New York Marine & Gen. Ins. Co. v. Becker, 254 F. App'x 235 (4th Cir. 2007). "In interpreting a contract of indemnity, the Court's function is to ascertain and give effect to the intention of the parties, and the ordinary rules of contract construction apply." Kirkpatrick & Assocs., Inc. v. Wickes Corp., 53 N.C. App. 306, 308, 280 S.E.2d 632, 634 (1981). Where the contract is plain and unambiguous on its face, the Court may interpret the contract as a matter of law. Schenkel & Shultz, 362 N.C. 269 at 273, 658 S.E.2d at 921. If the contract contains some latent ambiguity and thus the parties' intention is unclear, the interpretation of the contract is for the jury. Id.

The only defense to a valid indemnity agreement arises solely on a claim of "fraud or lack of good faith on the part of the surety." New York Marine, 2007 WL 160689, at *7; accord Fidelity & Deposit Co. of Md. v. Bristol Steel & Iron Works, Inc., 722 F.2d 1160, 1163 (4th Cir. 1983) (noting that only defense to indemnity agreement "arises when the payment has been made through fraud or lack of good faith on the part of the surety but any challenge to such payment must be rested solely on that claim of bad faith or fraud"). As Judge Mullen of this Court has explained:

33

> Bad faith is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity. Thus, a lack of diligence or negligence is not the equivalent of bad faith, indeed even gross negligence cannot support a finding of bad faith. Bad faith requires a showing of recklessness or improper motive such as self-interest or ill will.

Fid. & Guar. Ins. Co. v. Constr. Advantage, Inc., No. 1:08-CV-460-GCM, 2010 WL 726024, at *7 (W.D.N.C. Feb. 25, 2010).

Here, the provisions of the Indemnity Agreement at issue in Count I, II, and IV of Frankenmuth's Complaint (relating to the providing of collateral, free access to records and books, and holding Frankenmuth harmless, respectively) are all unambiguous.[12] National Bridge has not presented a forecast of evidence to support a finding of fraud or bad faith on the part of Frankenmuth. Further, Frankenmuth has presented a forecast of evidence, which National Bridge has not contested, that each of these provisions has been breached and that Frankenmuth is entitled to specific performance thereof. Accordingly, the Court concludes that Frankenmuth is entitled to summary judgment with respect to National Bridge's liability under the

---

[12] Frankenmuth has not moved for summary judgment with respect to Count III of its Complaint, which seeks specific performance of the provision of the Indemnity Agreement requiring the deposit by National Bridge of proceeds from certain contracts in a trust account created by Frankenmuth. [See Doc. 1 at ¶¶ 77-89; Doc. 1-1 at ¶ 11].

34

Indemnity Agreement to (1) deposit collateral with Frankenmuth in an amount determined to be sufficient to discharge any "Loss" or anticipated "Loss" pursuant to Paragraph 5 of the Indemnity Agreement; (2) furnish Frankenmuth with free access to its books, records, accounts, etc. for copying, examination, and/or auditing pursuant to Paragraphs 12 and 25 of the Indemnity Agreement; and (3) exonerate, indemnify, and hold Frankenmuth harmless from and against all Loss pursuant to Paragraph 3 of the Indemnity Agreement. The amount of collateral security to be provided and the amount of "Loss" for which National Bridge is responsible shall be determined at the trial of this matter.

## C. National Bridge's Counterclaims for Fraudulent Inducement and Chapter 75 Violation

Having disposed of the parties' motions regarding Frankenmuth's claims and the enforceability of the Indemnity Agreement, the Court now turns to National Bridge's counterclaims. In its First Counterclaim, National Bridge asserts a claim for fraud in the inducement. Notably, this claim does not pertain to any alleged fraud with respect to the formation of the Indemnity Agreement, but rather to an alleged subsequent promise by Frankenmuth to pay National Bridge $1,500,000. National Bridge alleges that such promise

was false as Frankenmuth never intended to pay the full amount. [Doc. 63: Am. Counterclaims at ¶¶ 51-69].

To recover for fraud in the inducement, a party must show "(1) false representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." Ward v. Fogel, 237 N.C. App. 570, 581, 768 S.E.2d 292, 301 (2014)).

Here, National Bridge has failed to present a forecast of evidence from which a reasonable jury could conclude that National Bridge was a victim of any fraud on the part of Frankenmuth. First and foremost, a claim for fraudulent inducement requires proof of a representation or concealment of a material *fact.* A promise to perform, however, is not a representation of a subsisting *fact.* See Glob. Hookah Distributors, Inc. v. Avior, Inc., 401 F. Supp. 3d 653, 658 (W.D.N.C. 2019) ("The mere failure to carry out a promise in contract . . . does not support a tort action for fraud."). Further, at best, National Bridge asserts that Frankenmuth offered a modification to the parties' existing contractual arrangement. It is unclear (and National Bridge offers no forecast of evidence), however, what the consideration for such modification might have been.

36

Contrary to National Bridge's arguments, it is evident from the record that Frankenmuth's loan/advancement of the $750,000 was not pursuant to the parties' contract, but rather was a means by which Frankenmuth was attempting to mitigate its own exposure under the Bonds. By assisting National Bridge in completing its contractual obligations and avoiding default, Frankenmuth was protecting its own interests. National Bridge has no legal basis to rely on an expectation that Frankenmuth might make further advancements in order to protect itself. Moreover, to the extent that National Bridge contends that it acted in reliance on Frankenmuth's promise to loan/advance additional funds, National Bridge has failed to show that it did anything that it was not already obligated to do under the parties' agreement. For all these reasons, National Bridge's counterclaim for fraud in the inducement must be dismissed.

Because National Bridge's Chapter 75 claim is premised entirely upon the same allegations giving rise to National Bridge's claim for fraudulent inducement claim [see Doc. 63: Am. Counterclaims at ¶¶ 70-77], the Court concludes that Frankenmuth is entitled to summary judgment on this claim as well.

37

### D. National Bridge's Counterclaim for Tortious Interference

To recover for tortious interference with contract, a party must show the following:

> (1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to the plaintiff.

United Labs, Inc. v. Kuykendall, 322 N.C. 643, 662, 370 S.E.2d 375, 387 (1988).

In its claim for tortious interference, National Bridge contends that Frankenmuth wrongfully interfered with National Bridge's contractual relationships with project owners by directly requesting the payment of proceeds of those contracts directly to Frankenmuth. [Doc. 63: Am. Counterclaims at ¶¶ 89-99]. This contention is without merit. As the Court noted in granting the preliminary injunction, if "the [Indemnity Agreement] is valid [which the undisputed forecast of evidence shows] and that Agreement grants [Frankenmuth] the right to take possession of contract payments, [National Bridge] [cannot] succeed in showing that [Frankenmuth] acted without justification in requesting that project owners submit contract payments to [Frankenmuth]." [Doc. 123 at 50].

38

National Bridge appears to have abandoned its argument that Frankenmuth tortiously interfered by requesting the proceeds of contracts. National Bridge's tortious interference claim now appears to be predicated on a theory that Frankenmuth "push[ed] project owners to issue notices of default." [See Doc. 127 at 24]. Critically, however, National Bridge has not presented any evidence that Frankenmuth coerced or otherwise solicited any project owner to default National Bridge.[13] To the contrary, the forecast of evidence before the Court indicates that NCDOT had deemed National Bridge's progress to be "unsatisfactory" and/or had defaulted National Bridge under a number of the Frankenmuth-bonded contracts before Frankenmuth had any interaction with NCDOT. [Doc. 123 at 15]. Further, during a September 1, 2021 meeting, Frankenmuth learned that National Bridge (1) had failed to make payment of properly due and owing bills in connection with the contracts; (2) lacked the financial ability to pay amounts owed to its subcontractors/suppliers for labor, material, equipment, etc. they had furnished in relation to the contracts; (3) lacked the financial ability to purchase materials needed to complete the contracts; and (4) had utilized the proceeds of the contracts for purposes other than paying obligations for

---

[13] Moreover, National Bridge has not pointed to where it has pleaded such a claim.

which Frankenmuth may be liable under the Bonds including, but not limited to, National Bridge's idle equipment and labor costs.

Upon learning such information, Frankenmuth had the contractual right under the Indemnity Agreement to take over and independently cause the completion of the contracts. Nevertheless, Frankenmuth loaned/advanced $750,000.00 to National Bridge on September 15, 2021 and permitted it to continue performing in hopes the project owners would not default National Bridge. Until January 7, 2022, Frankenmuth remained ready, willing, and able to loan/advance additional funds if National Bridge would have complied with Frankenmuth's conditions for such loans/advances, whether or not Frankenmuth had any contractual or legal obligation to do so.

As National Bridge has failed to present a forecast of evidence to demonstrate that Frankenmuth interfered with any of its contracts without justification, the Court concludes that Frankenmuth is entitled to summary judgment on this counterclaim.

### E. National Bridge's Counterclaim for Defamation

To recover for defamation, a party must show "that the defendant made false, defamatory statements of or concerning the plaintiff, which were published to a third person, causing injury to the plaintiff's reputation." Boyce

& Isley, PLLC v. Cooper, 211 N.C. App. 469, 478, 710 S.E.2d 309, 317 (2011).

In its counterclaim for defamation, National Bridge cites to one written communication[14] which took place on March 23, 2022, between Frankenmuth Director of Surety Claims Kathleen Maloney and Phyllis MacConnell of Trinity Products, Inc. ("Trinity"), a subcontractor/supplier for National Bridge projects. In that correspondence, Maloney stated that it was "Frankenmuth's position that National Bridge, its representatives and related entities have misappropriated and misused contract funds." [Doc. 68-7: 03/22/23 Letter].

Critically, however, National Bridge has failed to present a forecast of evidence from which a reasonable jury could conclude that Maloney's statement regarding Frankenmuth's "position" was, in fact, false. Accordingly, the Court concludes that Frankenmuth is entitled to summary judgment with respect to National Bridge's counterclaim for defamation.

---

[14] National Bridge also alleges "upon information and belief," that this statement was repeated to more than one Project owner, Project subcontractor, and/or Project supplier. [Id. at ¶ 109]. However, National Bridge has failed to present a forecast of evidence that this allegedly defamatory statement was repeated to any other project owner, subcontractor, or supplier.

# O R D E R

**IT IS, THEREFORE, ORDERED** that the Plaintiff's Motion for Summary Judgment [Doc. 117] is **GRANTED** as follows:

(1) Partial summary judgment is **GRANTED** in Frankenmuth's favor relative to National Bridge's liability with respect to Count I of Frankenmuth's Complaint sounding in specific performance of National Bridge's duty to deposit collateral with Frankenmuth in an amount determined to be determined at the trial of this matter;

(2) Partial summary judgment is **GRANTED** in Frankenmuth's favor relative to National Bridge's liability with respect to Count II of Frankenmuth's Complaint sounding in specific performance of National Bridge's duty to furnish Frankenmuth with free access to its books, records, accounts, etc. for copying, examination, and auditing pursuant to Paragraphs 12 and 25 of the Indemnity Agreement;

(3) Partial summary judgment is **GRANTED** in Frankenmuth's favor relative to National Bridge's liability with respect to Count IV of Frankenmuth's Complaint sounding in breach of National Bridge's contractual obligation to exonerate, indemnify, and save Frankenmuth harmless from and against all "Loss" pursuant to

42

Paragraph 3 of the Indemnity Agreement, with the amount of "Loss" to be determined at the trial of this matter;

(4)     Summary judgment is **GRANTED** in Frankenmuth's favor relative to National Bridge's First Counterclaim for relief sounding in fraudulent inducement, and such counterclaim is **DISMISSED WITH PREJUDICE**;

(5)     Summary judgment is **GRANTED** in Frankenmuth's favor relative to National Bridge's Second Counterclaim for relief sounding in unfair and deceptive trade practices, and such counterclaim is **DISMISSED WITH PREJUDICE**;

(6)     Summary judgment is **GRANTED** in Frankenmuth's favor relative to National Bridge's Fifth Counterclaim for relief sounding in tortious interference with contract, and such counterclaim is **DISMISSED WITH PREJUDICE**; and

(7)     Summary judgment is **GRANTED** in Frankenmuth's favor relative to National Bridge's Sixth Counterclaim for relief sounding in defamation, and such counterclaim is **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that the Defendant National Bridge Builders, LLC's Motion for Partial Summary Judgment [Doc. 119] is **DENIED**.

43

**IT IS SO ORDERED.**

Signed: August 18, 2023

Martin Reidinger
Chief United States District Judge